**DALLAS AEROSPACE, INC., Plaintiff–Counter–Defendant– Appellant,**

v.

**CIS AIR CORPORATION, Defendant– Counter–Claimant–Appellee.**

Docket No. 02–9347.

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 2003.

Decided Dec. 19, 2003.

Stuart A. Jackson, Ré, Parser & Partners, New York, NY, for Plaintiff–Appellant.

Patrick P. Salisbury, Salisbury & Ryan, New York, NY, for Defendant–Appellee.

Before: WALKER, Chief Judge, NEWMAN and CARDAMONE, Circuit Judges.

JOHN M. WALKER, Jr., Chief Judge.

Plaintiff-appellant Dallas Aerospace, Inc. ("Dallas"), a buyer of a used jet engine from defendant-appellee CIS Air Corporation ("CIS"), appeals from the judgment of the United States District Court for the Southern District of New York (Barbara S. Jones, *District Judge*), granting summary judgment to CIS.

Dallas and CIS are both corporations in the business of buying, selling, and leasing aircraft and aircraft engines. The various claims at issue in this appeal arose out of CIS's sale to Dallas of a JT8D engine in August 1997 under a written agreement. Months after the purchase, Dallas discovered that the engine had been involved in a hard landing years earlier that rendered the engine not "airworthy." "Airworthy" is a term of art in the aviation industry indicating that an engine is safe and that it comports with FAA requirements. Dallas brought this diversity action alleging various claims under New York law to recover the $1.15 million it paid for the engine.

The district court agreed with CIS that there was no genuine issue of material fact precluding a grant of summary judgment in CIS's favor and concluded that, as a matter of law: (1) for the purposes of Dallas's breach of contract claim, the agreement between Dallas and CIS, which disclaimed all representations about the engine, had not been modified; (2) for the purposes of its fraud claim, Dallas could not show it justifiably relied on any purported misrepresentation under the contract because (a) the contract specifically disclaimed the very representation alleged to be fraudulent, and (b) the truth of the allegedly misrepresented matter was easily discoverable by Dallas; (3) the contract terms were not unconscionable; and (4) no special relationship existed between the parties that would trigger a duty to dis-

close on CIS's part, for the purposes of Dallas's negligent misrepresentation claim.

## I. BACKGROUND

A Japan Air Systems ("JAS") aircraft experienced a hard landing in Japan in April 1993. While the ensuing fire substantially destroyed the aircraft, the engine remained intact and was salvaged from the wreckage. The insurance company that took title to the engine sold it to Charlotte Aircraft Corporation ("Charlotte"). In 1996, American Air Ventures, Inc. ("AAV"), a broker, negotiated the sale of the engine to CIS and took title from Charlotte pursuant to a separate contract before transferring it to CIS for $425,000, which was paid directly by CIS to Charlotte. CIS paid AAV a finder's fee of $10,000.

CIS understood that it would have to overhaul the engine to get it back into "serviceable" condition under guidelines established by the engine's manufacturer, Pratt & Whitney ("P & W"), for returning a used engine to service in compliance with FAA regulations. CIS claims that it had no specific knowledge of the hard landing, however, and undertook a less expensive overhaul that was appropriate for used, but not incident-related, engines. CIS sent the engine for overhaul to ST Aerospace ("ST"), a reputable repair shop authorized by the FAA, with overhaul instructions that had been provided by AAV. CIS asserts that it relied on AAV because CIS has no internal technical staff. CIS paid approximately $350,000 for the overhaul and, in due course, ST returned the engine to CIS, certifying it—mistakenly as it turned out—as airworthy. ST was not aware of the engine's incident-related status, which, under the P & W guidelines, would have necessitated a $500,000 overhaul.

Upon return of the engine to CIS, CIS found Dallas as a willing buyer in August 1997, and the two parties quickly reduced their agreement to a written contract, subject to Dallas's inspection of the engine and its records. While the contract between Charlotte and AAV expressly stated that the engine had been involved in an accident, neither the contract between AAV and CIS, nor the one between CIS and Dallas contained any such provision. The extent of CIS's own knowledge about the hard landing and CIS's corporate relationship with AAV are both disputed. It is undisputed, however, that Dallas was not told prior to its purchase about the hard landing in Japan or that ST's overhaul was other than adequate. Dallas's extensive baroscopic physical inspection of the engine prior to purchase revealed no defects and its month-long "back-to-birth" review of the engine's records did not bring the fact of the JAS accident to light. Accordingly, Dallas consummated its purchase of the engine from CIS.

Dallas's contract with CIS, dated August 26, 1997, (the "Agreement") disclaimed that CIS had made any representations regarding the engine. It specifically disclaimed any representation as to the engine's airworthiness in Paragraph 8 and obligated plaintiff to accept delivery of the engine and its records "as-is, where-is" in Paragraph 7. All of the exclusions and disclaimers in the Agreement were "conspicuous," as required by § 2-316 of the Uniform Commercial Code ("UCC"),[1] and the Agreement contained an integration clause stating that "no warranties, representations or undertakings have been made by either party except as expressly set forth herein." On August 29, 1997, Dallas signed the Agreement as well as an Engine Delivery Receipt, which recited

---

1. Throughout this opinion we discuss provisions of the UCC, all of which have been adopted by New York, effective September 27, 1964.

that Dallas "accepted delivery of" the engine and "confirms its acceptance of the [engine], in 'AS IS' 'WHERE IS' condition."

Dallas did not pay for the engine until September 9, 1997 or thereabout. Dallas claims that at the time it wire-transferred payment, it also delivered to CIS a purchase order that, after stating that "[a]ll the terms and conditions of this purchase are stated in the contract dated August 28, 1997," purported to modify the contract by requiring CIS to deliver a serviceable and airworthy engine that had "not been subjected to extreme stress or heat as in a major engine failure[,] accident, incident or fire." The status of the purchase order is a disputed issue and is discussed more fully in connection with Dallas's breach of contract claim below.

Dallas subsequently leased the engine to Sky Trek Airlines, and the engine was flown in daily service for several months without incident. In 1999, Dallas attempted to sell the engine, but the prospective buyer walked away from the negotiations after informing Dallas that the engine was incident-related. P & W confirmed this information to Dallas; P & W had always known about the engine's history because it keeps records on every engine it manufactures, including data related to incidents and accidents. While just who had access to the P & W records at the time of Dallas's negotiations with CIS is disputed, it is not disputed that both JAS and Charlotte knew about the engine's incident-related history and would not have withheld the information if they had been asked about it by Dallas at any time.

After unsuccessfully trying to recover its purchase price from CIS, Dallas filed suit against CIS for breach of contract, fraudulent misrepresentation, and negligent misrepresentation in the district court. Applying New York law, pursuant to the Agreement of the parties, the district court granted summary judgment in favor of CIS on all of Dallas's claims. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment *de novo.* Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. The Breach of Contract Claim

Dallas alleges that CIS breached their agreement by delivering an engine that was falsely represented as airworthy based on an airworthiness inspection for non-incident-related engines performed by ST. CIS responds that two clear and unambiguous contractual provisions in the Agreement disclaim any representation as to airworthiness. Paragraph 8 of the Agreement states (with emphasis in the original):

*DISCLAIMER OF WARRANTY Seller has not made and does not make, nor shall Seller be deemed to have made or given, and hereby expressly disclaims, any warranty, guaranty or representation, express or implied, as to ... the [engine's] title, airworthiness, design, value, operation, condition, quality,*

*durability, suitability, merchantability or fitness for a particular purpose* ....

Paragraph 13D of the Agreement states:

This Agreement contains the entire understanding of the parties with respect to the purchase and sale of the [e]ngine, and no warranties, representations or undertakings have been made by either party except as expressly set forth herein. Any other previous oral or written communications, representations, agreements or understanding between the parties are no longer of any force and effect, and are superseded and replaced in their entirety by the provisions of this Agreement.

Dallas asserts that the foregoing disclaimer provisions were nullified by a subsequent purchase order it claims to have delivered to CIS with its payment on September 9, 1997. The record, however, contains no affirmative testimonial or documentary evidence that the purchase order was ever sent by Dallas or that it was ever received by CIS. While we assume that it was sent and received for the purposes of summary judgment, Dallas's claim still fails as a matter of law.

The district court applied the standard "battle of the forms" analysis set forth in UCC § 2–207.[2] Accordingly, the district court rejected Dallas's purported modification because the new contract term contained in the purchase order "materially alter[ed]" the contract "without the express consent of [d]efendant;" it was therefore ineffective pursuant to UCC § 2–207(2)(b). Dallas argues that the district court erred in applying § 2–207 to construe the purported modification, and that the applicable provision is UCC § 2–209.

We need not decide whether § 2–207 or § 2–209 is the proper provision under which Dallas's purchase order should be construed;[3] under either provision the purported modification was ineffective.

1. UCC § 2–207

██ Dallas does not dispute the district court's conclusion that under § 2–207 the additional terms contained in its purchase order "materially altered" the terms of the Agreement, and thus were ineffective ab-

2. Section 2–207 reads, in relevant part, as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer; [or]

(b) they materially alter it ....

3. Indeed, the answer to this question is not entirely clear under New York law. *Compare Lorbrook Corp. v. G & T Indus., Inc.,* 162 A.D.2d 69, 562 N.Y.S.2d 978, 980 (1990) (applying § 2–207 to determine if purchase order modified "pre-existing binding contract"); *Marcus Bros. Textiles, Inc. v. Avondale Mills, Inc.,* 78 A.D.2d 800, 433 N.Y.S.2d 114, 115–16 (1980) (applying § 2–207 to determine if confirmation orders modified signed "sales notes" that constituted "valid contracts"), *with CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.,* 81 N.Y.2d 174, 597 N.Y.S.2d 284, 613 N.E.2d 159, 162 (1993) (holding that "[o]nce a contract is formed, ... we look to UCC [§§ ] 2–208 and 2–209, not 2–207," to determine if alleged modifications are enforceable); *Marlene Indus. Corp. v. Carnac Textiles, Inc.,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, 241 (1978) (explaining that § 2–207 is "intended to include at least two distinct situations:" (1) where the parties have reached a prior oral contract and the writing containing the additional term is a confirmation of that contract; and (2) where no actual contract has yet formed and the writing containing the additional term is an acceptance of an outstanding offer).

sent CIS's express assent. Nor could it, given that the terms contained in the purchase order voided the express disclaimers contained in the Agreement, thereby altering the allocation of risk expressly agreed upon by the parties.

*Lorbrook Corp. v. G & T Indus., Inc.,* 162 A.D.2d 69, 562 N.Y.S.2d 978 (App.Div. 1990), cited by the district court, reinforces the point. There, a party's attempt to add a *forum non conveniens* clause by means of a purchase order that was issued without the express consent of the other party was held to be an ineffective material alteration under § 2–207. As was the case in *Lorbrook,* Dallas's attempt here to undo the agreed-upon disclaimer of representations can only be considered "an unsuccessful ploy . . . unilaterally to add a term not covered by the preexisting binding contract." *Id.* at 980.

### 2. UCC § 2–209

UCC § 2–209, entitled "Modification, Rescission and Waiver," states, in relevant part:

(1) An agreement modifying a contract within this Article needs no consideration to be binding.

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . .

(3) The requirements of the statute of frauds section of this Article (Section 2–201) must be satisfied if the contract as modified is within its provisions.

As Dallas notes, the Agreement does not exclude modifications, so § 2–209(2) does not apply. However, because the Agreement as purportedly modified is a sale of goods for $500 or more, it does fall within UCC § 2–201, the statute of frauds. The relevant portions of UCC § 2–201 read:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . .

. . .

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . (c) with respect to goods for which payment has been made and accepted or which have been received and accepted . . . .

Dallas argues that the modification satisfies § 2–201 because although CIS did not sign the modification embodied in the purchase order after it purportedly received it, CIS accepted payment for the engine after it received the purchase order with the modification, signifying its intention to be bound by it under § 2–201(3)(c). Thus, Dallas urges, §§ 2–209 and 2–201(3)(c), when applied together, give effect to the terms of the purchase order.

This argument is misguided. The function of § 2–201(3)(c) is to preclude a party from raising a statute of frauds defense where the parties have already performed their obligations under the alleged contract. The rationale underlying the exception is that "[r]eceipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists." N.Y. UCC § 2–201, Official Comment ¶ 2. Accordingly, partial performance of contractual obligations validates a contract, but only to the extent of such partial performance. *Id.* Here, however, because acceptance of payment for the engine was entirely consistent with CIS's pre-existing rights and obligations under the unmodified Agreement, it cannot be said that CIS's performance "constitute[d] an unam-

biguous overt admission" that the contract had been modified.

■ But even if the purchase order did satisfy § 2–201(3)(c), that fact is insufficient alone to render it an enforceable modification under § 2–209. Compliance with § 2–201 is only one of the requirements a purported modification must meet; its purpose is solely "to remove the bar of the [s]tatute of [f]rauds." *Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 538 N.Y.S.2d 503, 535 N.E.2d 633, 637 (1989); N.Y. UCC § 2–201, Official Comment ¶ 3.

■■ To be enforceable under § 2–209, the purported modification must still be based on an agreement to modify, as required under § 2–209, as well as be "valid in other respects," as required under § 2–201. Under New York law, parties may modify a contract "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 597 N.Y.S.2d 284, 613 N.E.2d 159, 162 (N.Y.1993); *see Martin v. Peyton*, 246 N.Y. 213, 158 N.E. 77, 78 (1927). Indeed, "[f]undamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (1980); *see also Becker v. Faber*, 280 N.Y. 146, 19 N.E.2d 997, 998 (1939) (holding that contractual obligations cannot be modified without the consent of the party that has assumed the obligation).

Dallas does not contend that the purchase order constituted a mutual agreement to modify. Instead, it argues that CIS's course of performance demonstrated mutual assent to the modification. Dallas relies primarily on *Hunt Oil Co. v. FERC*, 853 F.2d 1226, 1240–41 (5th Cir.1988), where the court applied UCC § 2–209 to-

gether with § 2–201(3)(c) and held that a contract modification was enforceable under Mississippi and Texas law. There, however, the parties' subsequent course of performance of the contract confirmed a prior oral modification. Here, Dallas concedes that there was no oral modification. Rather, it contends that CIS's acceptance of payment amounted to a course of performance signifying its assent. However, a single act of accepting payment is not a course of performance sufficient to demonstrate mutual assent. *See* UCC § 2–208(1); 1 James J. White & Robert S. Summers, Uniform Commercial Code, § 1–6(c), at 48 & n. 39 (4th ed.1995); *cf. CT Chems.*, 597 N.Y.S.2d 284, 613 N.E.2d at 162 (requiring "*repeated* occasions for performance and opportunity for objection") (emphasis added).

■■ Moreover, for a course of performance to demonstrate mutual assent to a modification, it must be "unequivocally referable" to the modification. *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279, 1283 (1977); *All–Year Golf, Inc. v. Prods. Investors Corp.*, 34 A.D.2d 246, 310 N.Y.S.2d 881, 885 (1970). Similarly, for conduct to amount to a waiver or estoppel, it "must not otherwise be compatible with the agreement as written;" rather, "the conduct of the parties [must] evidence[ ] an indisputable mutual departure from the written agreement." *Rose*, 397 N.Y.S.2d 922, 366 N.E.2d at 1283. Here, because CIS's acceptance of payment after having delivered the engine was wholly consistent with the Agreement, it fails to demonstrate mutual assent to the modification. *See Beacon Terminal*, 429 N.Y.S.2d at 717–18 (fact that defendant paid bills charging higher rate did not demonstrate mutual assent to higher rate).

While we have assumed for summary judgment purposes that the purchase or-

der was sent and received at some point, that assumption cannot be used to bootstrap a finding of mutual assent absent some evidence that CIS received it prior to accepting payment and issuing the bill of sale. *See Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."). Because Dallas's payment was sent by wire transfer, the purchase order was necessarily sent through other channels. Dallas's witness testified that, as a general matter, Dallas "mailed [purchase orders] out. [It] often fax[es] them out beforehand." Thus, even if we assumed that the purchase order and payment were sent simultaneously, there is no evidence to support a finding that CIS received the purchase order prior to its accepting payment and issuing the bill of sale the next day. In any case, Dallas signed an Engine Delivery Receipt on August 29, 1997 representing that it accepted the engine "WHERE–IS," rendering the purchase order an attempt to accept anew, with a new condition, something it had already accepted more than a week before; Dallas plainly doesn't contend that it revoked its acceptance of August 29, 1997.

Finally, we note that while CIS's course of conduct was at all times consistent with the terms of the Agreement, Dallas's own conduct was inconsistent with the belief that the Agreement had been modified. As noted by the district court, Dallas did not assert that the Agreement had been modified until it filed its opposition to CIS's motion for summary judgment, some twenty-one months after the litigation began. In addition, Dallas's Complaint admitted that the Agreement was the contract between the parties; numerous witnesses for Dallas acknowledged that its contract with CIS was the one announced in the Agreement, without mentioning the purported modification; and Dallas's inventory receipt of September

ber 16, 1997—well after CIS accepted payment—makes reference to the purchase order but still recites that the terms and conditions associated with the engine are contained in the Agreement of August 1997. While this conduct falls largely beyond the course of contract performance, it reinforces our conclusion here that the asserted modification was ineffective. *Cf. CT Chems.,* 597 N.Y.S.2d 284, 613 N.E.2d at 162 (refusing to enforce alleged modification where parties' subsequent course of conduct was inconsistent with terms of modification).

Under all of the circumstances, no reasonable jury could find that the parties agreed to modify the Agreement so as to nullify its disclaimer provisions. Accordingly, for all the foregoing reasons, the district court's grant of summary judgment on the appellant's breach of contract claim is affirmed.

## C. The Fraudulent Misrepresentation Claim

To succeed on a theory of fraudulent misrepresentation under New York law, a plaintiff must show that the defendant made a false representation of a material fact to the plaintiff and that the plaintiff suffered injury as a result of justifiable reliance upon that fact. *See Sec. Investor Prot. Corp. v. BDO Seidman, L.L.P.,* 95 N.Y.2d 702, 723 N.Y.S.2d 750, 746 N.E.2d 1042, 1047 (2001); *Brackett v. Griswold,* 112 N.Y. 454, 20 N.E. 376, 379 (1889) ("[The] elements . . . requisite to sustain an action for [fraud are] . . . a false representation, known [by defendant] to be such, made by the defendant, calculated and intended to influence the plaintiff, and which came to his knowledge, and in reliance upon which he, in good faith, . . . [suffered] the injury of which he complains."). Under New York law, each element of a fraud claim must be proven by

clear and convincing evidence. *See Hutt v. Lumbermens Mut. Cas. Co.*, 95 A.D.2d 255, 466 N.Y.S.2d 28, 30 (1983).

Dallas alleges that "[w]hen CIS Air delivered to [plaintiff] the [e]ngine [r]ecords, CIS Air knew that the [e]ngine [r]ecords falsely certified the [e]ngine as airworthy." Plaintiff's Complaint ¶ 25. Dallas offers evidence, hotly disputed by CIS, that CIS knew the engine was involved in a hard landing, though there is no dispute that CIS failed to disclose that fact. For the purposes of this appeal and CIS's motion for summary judgment, we accept as true Dallas's elaborate conspiracy theory—that CIS and AAV were in cahoots to defraud Dallas—and we thus assume that CIS made a material misrepresentation. Dallas's fraud claim founders, nevertheless, because Dallas cannot demonstrate justifiable reliance on the misrepresentation given the Agreement's explicit disclaimers and Dallas's ability to discover the truth about the misrepresentation.

■ For the reasons discussed in connection with Dallas's breach of contract claim, we conclude that the relevant agreement on the fraud claim is the Agreement signed by both parties in August 1997, unmodified by Dallas's purchase order. That Agreement precludes Dallas from claiming reliance on any asserted misrepresentation because a party cannot justifiably rely on a representation that has been disclaimed by agreement. *See Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 599 (1959). To be sure, it is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud. *See id.* at 598–99 (citing *Bridger v. Goldsmith*, 143 N.Y. 424, 38 N.E. 458 (1894)). However, a party cannot justifiably rely on a representation that is specifically disclaimed in an agreement, as occurred here. *Id.* In this case, the Agreement, in Paragraph 8,

explicitly disclaims any representations about the airworthiness of the engine. In addition to Paragraph 8, 'the Agreement's integration clause, Paragraph 13D, specifies that the written Agreement "supersede[s] and replace[s] in their entirety" "[a]ny other previous oral or written communications, representations, agreements or understanding between the parties." Moreover, the Engine Delivery Receipt contains a conspicuous " 'AS IS' 'WHERE IS' " acknowledgment of receipt of the engine in its then-current condition, a receipt the Agreement required Dallas to execute at Paragraph 7. Section 2–316(3)(a) of the UCC provides that the term "as is," when used in a contract for the sale of goods, negates all implied warranties concerning the condition of the goods. *See also* UCC § 2–316(3), Official Comment ¶ 7. As we recognized in *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir.1984), *Danann* "stands for the principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship."

■ Dallas argues that its case comes within a recognized exception to *Danann* for misrepresented facts that are "peculiarly within" the knowledge of the declarant. *See Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998); *Danann*, 184 N.Y.S.2d 599, 157 N.E.2d at 600. "That exception holds that if the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." *Warner Theatre*, 149 F.3d at 136.

This exception raises the question of what it means for a fact to be "peculiarly within" someone's knowledge, a question

that New York case law does not clearly answer. The district court agreed with Dallas that to defeat the "peculiarly within" exception, the plaintiff must have a means to ascertain the truth underlying a misrepresentation that has been made by the defendant.

Dallas claims that it could not have directly obtained P & W's Engine Event History ("EEH") because they were exclusively accessible only to owners at the relevant time period at issue. Therefore, Dallas argues, it should be irrelevant that the P & W report exposed the fact that the engine was incident-related. We are inclined to agree with Dallas (and disagree with the district court) that the EEH's direct availability to Dallas presented an open factual question that could not be resolved on summary judgment. Nevertheless, the existence of this factual dispute does not defeat CIS's entitlement to summary judgment because Dallas had independent means of learning about the engine's history. As Dallas conceded at oral argument, both Charlotte and JAS knew about the hard landing and would have disclosed it to anybody if asked. Of course, Dallas knew of their prior ownership of the engine. Finally, even if Dallas is correct that only owners could procure the P & W reports, Dallas could have asked CIS to procure one for it. Accordingly, we agree with the district court that the hard landing was not "peculiarly within" CIS's knowledge because Dallas had "available the means of ascertaining the truth," which "was readily accessible to any interested party who cared to make inquiry." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 156–57 (2d Cir.1995) (internal quotation marks omitted).

■ Dallas counters that it was not put on inquiry notice about the misrepresentation and, therefore, that it was not "reckless" in failing to investigate further the airworthiness of the engine. Under the law of New York, however, whether Dallas was reckless or on inquiry notice is not relevant in this buyer-seller context involving a signed agreement containing a disclaimer of the very representation alleged to have been fraudulently made. The "recklessness" standard invoked by Dallas is drawn from the Section 10b–5 securities fraud context; it is inapposite in the context of an ordinary fraud action between two experienced and sophisticated parties. *See, e.g., Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015–16 (2d Cir.1989) (using the "recklessness" standard in the context of a securities fraud action). Moreover, even the cases involving the recklessness standard in the securities fraud context do not involve a signed disclaimer for the very representation alleged to have been fraudulent. Indeed, the disclaimer in the Agreement alone would satisfy an inquiry notice requirement if there were one. Dallas's failure to discover a fact that it reasonably could have brought to light with minimal effort, when combined with the fact that Dallas signed an agreement disclaiming that any representations as to airworthiness had been made, defeats its claim for fraudulent misrepresentation. We thus affirm the district court's grant of summary judgment to CIS on the fraud claim.

## D. The Unconscionability Claim

■ Dallas also filed a claim asserting that the Agreement with CIS is unenforceable because the disclaimer provisions were (or are) unconscionable. We agree with the district court that this claim lacks merit. While decisions about unconscionability are for the court to decide as a matter of law, the parties must be afforded a reasonable opportunity to present evidence as to a contract term's "commercial setting, purpose and effect to aid the court in making the determination." UCC § 2–

302(2). We conclude that Dallas, having been given such an opportunity, has presented no basis for declaring any aspect of the Agreement unconscionable.

The district court ruled that the disclaimers could not be found unconscionable because of the "sophisticated" nature of the parties and their "equal bargaining power." Appellant suggests that this ruling was an error of law because the district court failed to make specific findings about "procedural" and "substantive" unconscionability. Since our review is *de novo*, we may fill any gaps left by the district court's analysis.

In *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828 (1988), the New York Court of Appeals held that in order to determine whether there has been procedural unconscionability in the contract formation process, a court must assess such factors as: (1) the size and commercial setting of the transaction; (2) whether there was a "lack of meaningful choice" by the party claiming unconscionability; (3) the "experience and education of the party claiming unconscionability;" and (4) whether there was "disparity in bargaining power." *Id.* The court added that "deception," "high-pressured tactics," and the "use of fine print" were also appropriate factors to consider in the analysis. *Id.*

As the district court observed, the Dallas–CIS transaction was between two sophisticated parties, both of whom had meaningful choice and relevant experience and education. Furthermore, there was little disparity in their relative bargaining power; if anything, Dallas had an advantage in its technical ability to investigate an engine and its history because it had a technical department and knew that CIS did not. Dallas properly argues that any alleged "misrepresentation and fraud on the part of the seller" should be considered in determining whether the disclaimer was

unconscionable. However, the Agreement's conspicuous and specific provisions disclaiming any representation as to airworthiness, the very thing about which appellant alleges a misrepresentation, render it especially difficult to find procedural unconscionability under New York law. Indeed, the case Dallas relies upon, *Price Bros. Co. v. Olin Constr. Co.*, 528 F.Supp. 716, 720 (W.D.N.Y.1981), states that "'if the written contract included a specific disclaimer of the very representation later alleged to be the foundation for rescission ... proof [of the misrepresentation is to] be barred.'" *Id.* (quoting *Centronics Fin. Corp. v. El Conquistador*, 573 F.2d 779, 782 (2d Cir.1978)).

■ Nor is there merit in Dallas's claim that the contract provision disclaiming CIS's representations is substantively unconscionable. Dallas claims that contractual terms may be rejected for substantive unconscionability alone when "the terms of a bargain are unconscionable in their actual, real-world application or effects." But *Gillman* emphasizes that it is only in the truly "exceptional case[ ]" that substantive unconscionability alone can vitiate a contractual duty. 537 N.Y.S.2d 787, 534 N.E.2d at 829. This is not such a case.

Assuming, however, that we should look to real-world effects, we note that Dallas cannot rebut CIS's assertion that the engine was neither "worthless" nor a "good[ ] of essentially no value," as Dallas asserts. Because Dallas itself leased the engine to Sky Trek Airlines for several months, Dallas was able to recoup a part of the purchase price. Moreover, the engine-related costs to CIS were substantial: $425,000 for its own purchase of the engine, approximately $350,000 for the overhaul, and $200,000 in other costs. CIS's net profit of 18 percent on its investment plainly does not rise to the level of substantive uncon-

scionability. If Dallas ended up with a contract it does not like, that is the "real-world" consequence of its own failure to complete an adequate inquiry into an engine that it agreed to accept in an " 'AS-IS' 'WHERE–IS' " condition.

In any event, the UCC's unconscionability provision, UCC § 2–302, explicitly states that unconscionability is to be assessed "at the time" of the contract. UCC § 2–302(1). Dallas offers *Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enters., Inc.,* 58 A.D.2d 482, 396 N.Y.S.2d 427, 432 (1977), for the proposition that, notwithstanding the express provisions of § 2–302, we may assess unconscionability by considering later developments. Treatises dutifully cite *Industralease* as the lone exception to the general rule set forth in § 2–302, *see, e.g.,* E. Allan Farnsworth, Contracts, § 4.28 n. 52 (2d ed.1990), and a search for other cases applying this exception in New York has yielded only a single decision issued by a small claims court. *See La Vere v. R.M. Burritt Motors, Inc.,* 112 Misc.2d 225, 446 N.Y.S.2d 851 (1982). But even if we were to accept Dallas's invitation to examine later developments in assessing substantive unconscionability, this approach would be unavailing because, as *Industralease* makes clear, the plaintiff still must demonstrate a level of procedural unconscionability, something we have found it cannot show.

Accordingly, we affirm the grant of summary judgment on Dallas's unconscionability claim.

## E. The Negligent Misrepresentation Claim

 Finally, we turn to Dallas's claim of negligent misrepresentation. It is settled New York law that the elements of negligent misrepresentation are: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage. *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315, 319 (1977). Most relevant, the action requires that (5) the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care. *Id.* In New York, "not all representations made by a seller of goods ... will give rise to a duty to speak with care." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450, 454 (1996). Instead, the law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified. *Id.*

Dallas urges that *Kimmell* enunciated a new standard, exacting liability whenever the relationship between the parties is "such that in morals and good conscience the one has the right to rely upon the other for information." *Id.* This is a misreading of the case. The court did not depart from the traditional understanding that "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party." *Id.* Indeed, the assertedly "new" standard stated in *Kimmell* was a quotation from a New York Court of Appeals decision that preceded it by seven decades. *See Int'l Prods. Co. v. Erie R.R. Co.,* 244 N.Y. 331, 155 N.E. 662, 664 (1927), *quoted in Kimmell,* 652 N.Y.S.2d 715, 675 N.E.2d at 454. Thus, *Kimmell* can hardly be understood to be novel or to have shifted New York law. In sum, *Kimmell,* which has since been limited by the New York Court of Appeals, *see, e.g., Murphy v. Kuhn,* 90 N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972, 974–76 (N.Y.1997), does nothing to undermine the basic require-

ment of a "special relationship" for a negligent misrepresentation tort action.

It is also worth noting that *Kimmell*'s finding that the defendant in that case was liable because there was a special relationship between the parties rested largely on the fact that the defendant testified that "he expected plaintiffs to rely on [his] projections," that he informed plaintiffs "that he could provide 'hot comfort' should plaintiff[s] entertain any reservations about investing," and that he "represented" his projections as "reasonable." 675 N.E.2d at 454–55. No similar fact pattern is alleged in the case before us here. To the contrary, CIS disclaimed any representations and made reasonable efforts to alert Dallas of its intention to make no representation as to airworthiness. Moreover, as we have stated, Dallas cannot claim it relied on CIS's special expertise because it is clear that Dallas itself had the relevant expertise at issue.

Accordingly, we also affirm the grant of summary judgment to CIS on Dallas's negligent misrepresentation action.

## III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of appellee CIS is affirmed.