**ANTIDOTE INTERNATIONAL FILMS, INC. a New York corporation, Plaintiff,**

v.

**BLOOMSBURY PUBLISHING, PLC, a corporation, Underdogs, Inc., a corporation, Laura Albert, a/k/a J.T. Leroy, an individual, and Judi Farkas, an individual, Defendants.**

No. 06 Civ. 6114(JSR).

United States District Court, S.D. New York.

Dec. 29, 2006.

Gregory Lee Curtner, Kimberly K. Kefalas, Susan I. Robbins, Miller, Canfield, Paddock and Stone, P.L.L.C., New York, NY, for Plaintiff.

Toby Michael John Butterfield, Mason Andrew Weisz, Cowan, Debaets, Abrahams, Eric Weinstein, David John Galalis, Feldman Weinstein, LLP, Edward Henry

Rosenthal, Frankfurt Kurnit Klein & Selz, P.C., New York, NY, for Defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

By motions made October 20, 2006 pursuant to Fed.R.Civ.P. 12(b)(6), defendant Bloomsbury Publishing, PLC ("Bloomsbury") moved to dismiss all claims against it (Counts I, II, and III of plaintiff's First Amended Complaint) and defendants Laura Albert a/k/a J.T. Leroy and Underdogs, Inc. ("Underdogs") moved to dismiss Counts I, II, IV, VII, and VIII against them. By Order dated November 29, 2006, the Court dismissed Counts I, II, and IV against all defendants (including defendant Judi Farkas, even though she has not moved), and denied the motions in all other respects. This Memorandum Order reconfirms that Order and states the reasons for those rulings.

The pertinent allegations of the First Amended Complaint ("Am.Compl."), taken most favorably to plaintiff for purposes of this motion, are as follows. Plaintiff Antidote International Films, Inc. is an independent film production company based in New York. Am. Compl. ¶ 11. Defendant Bloomsbury is a publishing company based in London. *Id.* ¶ 12. Defendant Laura Albert is an individual who allegedly wrote the novel *Sarah* under the name of J.T. Leroy, a persona she created. *Id.* ¶ 14. Defendant Underdogs is a Nevada Corporation that Laura Albert created as a front to handle "J.T. Leroy's" business interests. *Id.* ¶ 13. Defendant Judi Farkas is an individual who has acted as a manager for J.T. Leroy, Underdogs, and Albert. *Id.* ¶ 15.

In April 2000, Bloomsbury published the novel *Sarah,* which was purportedly the first novel by J.T. Leroy. *Id.* ¶ 23. *Sarah* tells the story of a 12–year–old male prostitute nicknamed Cherry Vanilla, who com-petes with his mother, Sarah, for tricks at truck stops. *Id.* ¶ 24. Although *Sarah* was published as fiction, defendants allegedly made public statements in press releases, on a website, in book blurbs, and in other advertising in the course of marketing *Sarah* suggesting that the novel drew on J.T. Leroy's own personal history. *Id.* ¶¶ 25–27.

The First Amended Complaint gives a number of examples of such statements. First, Bloomsbury's website contains a page of "author information" about J.T. Leroy, stating that J.T. Leroy "embarked upon a roadtrip across America at the age of thirteen with his mother," who "abandoned him when they reached San Francisco," leading him "into a spiral of drug abuse and prostitution." *Id.* ¶ 27.a. Similarly, Bloomsbury USA's website says that J.T. Leroy wrote most of the stories in a collection published after *Sarah* "between the years of '94 & '97, at the time never thinking of publication, but needing to write to survive emotionally during a very difficult period of his life." *Id.* ¶ 27.b. Bloomsbury issued a press release that said "[t]he world of *Sarah* is one which the average person will never experience. Under Leroy's expert hand what initially seems deviant and strange becomes heartbreaking and wonderful as a boy's feelings and struggles with identity become universally recognized." *Id.* ¶ 27.c. Finally, in another press release issued in connection with Leroy's second book, Bloomsbury wrote that "JT Leroy first burst on the scene with his debut novel *Sarah,* which astonished reading audiences with a literary flair paired with heartbreaking, semi-autobiographical writing." *Id.* ¶ 27.d.

Albert took things one step further by pretending she was J.T. Leroy in various communications via fax, email, and telephone. *Id.* ¶ 33. For rare public appearances, Albert would appear as Leroy's

keeper, "Speedie," and the role of Leroy would be played by a woman named Savannah Knoop, in dark sunglasses and a wig, who was the half-sister of Albert's long-time companion Gregory Knoop. *Id.* ¶¶ 33–34. Neither of the Knoops is a party here.

Jeffrey Levy–Hinte, not himself a party here, is the founder of plaintiff Antidote. *Id.* ¶ 11. Mr. Levy–Hinte was "swallowed whole and reeled in" by "the authenticity of *Sarah's* narrative" and decided to "develop[ ] a film based on the story." *Id.* ¶ 36. Plaintiff alleges that "what made *Sarah* interesting and compelling" to Mr. Levy–Hinte was "precisely the knowledge that the novel was an aesthetic response to a horrific, real-life set of experiences." *Id.* ¶ 38. "Levy–Hinte believed that 'Leroy' had managed to use art to understand, interpret and master a personal history of neglect, abuse and violence. The alleged truth behind the novel created greater sympathy for the novel's narrative character, Cherry Vanilla, who was supposedly based on 'Leroy' himself." *Id.*

Antidote negotiated with Farkas and other agents for Underdogs, Albert, and Leroy to purchase a one-year option on the film rights to *Sarah* for $15,000, and plaintiff later extended this option for two additional one-year periods for $15,000 per year. *Id.* ¶ 39. During and after the negotiation of the option contract, defendants Underdogs, Albert, and Farkas allegedly took various steps to convince plaintiff that Leroy was real. *Id.* ¶ 40. For example, these defendants provided Antidote with a false IRS Form W–9 signed by J.T Leroy on August 1, 2003, *id.* ¶ 40.a, arranged a meeting between J.T. Leroy and plaintiff, at which Savannah Knoop played the part of Leroy, *id.* ¶ 40.b, executed the contract with plaintiff in the name of J.T. Leroy, *id.* ¶ 40.c, and communicated by phone, fax

and email with plaintiff in the name of J.T. Leroy, *id.* ¶ 40.d.

In the Fall of 2005, journalist Stephen Beachy published an article in New York Magazine claiming that J.T. Leroy did not exist. *Id.* ¶ 41. Other such articles soon followed in other publications, *id.* ¶ 42, and Underdogs, the defendant corporation, was traced to defendant Laura Albert through its president and secretary, Albert's mother Carolyn, *id.* ¶ 43. Antidote stopped working on the film adaptation of *Sarah* when Beachy published his article. *Id.* ¶ 44. Antidote confirmed that J.T. Leroy did not exist when Leroy's representatives provided chain-of-title documents that listed defendant Albert as the author of *Sarah.* *Id.* ¶ 47.

At this point, Mr. Levy–Hinte, as well as the prospective director of the movie version of *Sarah,* lost interest in making the movie. *Id.* ¶¶ 50–51. In addition, plaintiff alleges that "[d]efendants' fraud has made it virtually unthinkable that a distributor or a financier would ever invest any significant money into backing a project based solely on *Sarah* " because "[t]he book is discredited and a joke in the eyes of many," *id.* ¶ 52, and because the "value" of *Sarah* "was always predicated on the connection between 'Leroy,' his experiences, and the literary works," *id.* ¶ 53. Presently, defendants continue to promote and publicize "the 'J.T. Leroy' persona," including on the website "www.jtleroy.com." *Id.* ¶ 55.

Against this background, the Court turns first to the motions filed by Bloomsbury and by Underdogs and Albert to dismiss Count I, which alleges false designation of origin in violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. 1125 ("Lanham Act"). Section 43(a)(1)(A) prohibits the use, "on ... any goods," of "any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to

deceive . . . as to the origin" of the goods. Plaintiff alleges that defendants' representations "that the novel *Sarah* was authored by a person known as 'J.T. Leroy'" and that "*Sarah* is a semi-autobiographical novel based on actual experiences and hardships suffered by the fictional persona known as 'J.T. Leroy,'" together with defendants' other representations "of and relating to the false personal history of the persona known as 'J.T. Leroy'" together "constitute a false designation of origin under § 43(a)(1)(A) of the Lanham Act." Am. Compl. ¶¶ 63–65.

■ This claim is foreclosed by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). In *Dastar*, the Supreme Court addressed whether the word "origin" in the Lanham Act could be read to refer to the author of a work, such as a novel, rather than to the producer of the physical book. The Court recognized that "[t]he purchaser of a novel is interested not merely, if at all, in the identity of the producer of the physical tome (the publisher), but also, and indeed primarily, in the identity of the creator of the story it conveys (the author)." *Id.* at 33, 123 S.Ct. 2041. The Court refused, however, to accord "special treatment" to "communicative products"—that is, to read the word "origin" in the Lanham Act to cover the authors of communicative products—on the ground that such treatment would "cause[ ] the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." *Id.* Accordingly, the Court held that the phrase "origin" of "goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37, 123 S.Ct. 2041.

■ Plaintiff argues that in spite of *Dastar*, this Court should accord "special treatment" to the communicative product at issue in this case, the novel *Sarah*, and treat the author of the work (the fictional "J.T. Leroy"), rather than the producer of the physical books (defendant Bloomsbury), as the "origin" of the book under the Lanham Act. Plaintiff argues that *Dastar* does not preclude such treatment because the plaintiff in *Dastar* was attempting to vindicate a copyright claim that was unavailable because the underlying work was in the public domain, whereas in this case Antidote is not trying to vindicate any copyright. But nothing in *Dastar* suggests that communicative products such as novels may be accorded "special treatment" under the Lanham Act where no copyright claim is available. Rather, *Dastar* holds that the fact that copyright law covers "communicative products" prevents these products from being accorded "special treatment" under the Lanham Act regardless of whether a viable copyright claim exists in a given case. Accordingly, plaintiff cannot prevail on its Lanham Act claim because, pursuant to *Dastar*, Bloomsbury is the "origin"—that is, the manufacturer—of the physical books in which the novel *Sarah* is printed, and plaintiff does not claim that Bloomsbury was not properly designated as such.

Plaintiff further attempts to distinguish *Dastar* by arguing that defendants' false representations here are likely to cause confusion not only with respect to the "origin" of *Sarah*, but also with respect "the affiliation, connection, or association of [Bloomsbury] with another person," that is, "the imaginary 'J.T. LeRoy.'" § 43(a)(1)(A). Count I alleges only "false designation of origin" and not that any of defendants' actions caused confusion with respect to the affiliation, connection, or association of Bloomsbury with J.T. Leroy.

*See* Am. Compl. ¶¶ 57–68. Plaintiff had the chance to cure this defect in the First Amended Complaint (which plaintiff filed after Underdogs and Albert had already moved to dismiss plaintiff's original complaint), but chose not to do so. But even if the First Amended Complaint had contained the necessary allegations, such allegations would simply restate plaintiff's claim that Bloomsbury falsely designated the origin of *Sarah*—which fails for the reasons set out above—in different terms. *Dastar* holds that a claim for false designation origin is unavailable where the "origin" in question is the authorship of a communicative work. This holding necessarily applies with equal force to any claim for "false . . . representation[s]" with respect to the "affiliation . . . of [one] person with another person," where, as here, one person is the publisher of a novel and the other is the author of the novel, because the holding of *Dastar* would be meaningless if a false authorship claim could be recast in this manner.

■ Accordingly, by its Order dated November 29, 2006, this Court granted the motions filed by Bloomsbury and by Underdogs and Albert to dismiss plaintiff's claims under § 43(a)(1)(A) of the Lanham Act, i.e., Count I of the First Amended Complaint. Further, although defendant Farkas had not moved, the Court dismissed plaintiff's claims under § 43(a)(1)(A) against her as well. "[W]hile dismissing a complaint as to a non-moving defendant is not an ordinary practice, a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue." *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F.Supp.2d 576, 580 (S.D.N.Y.2002) (footnotes omitted) (citing *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir.1994)). It would be a waste

of judicial resources to allow this legally defective claim, as to which plaintiff has been fully heard, to be pursued against Farkas just because she has not yet moved to dismiss it.

Turning to Count II, defendants Bloomsbury, Underdogs, and Albert sought in their motions to dismiss this count, which alleges false advertising under § 43(a)(1)(B) of the Lanham Act, on the ground that it was also precluded by *Dastar*. Section 43(a)(1)(B) prohibits misrepresentations going to "the nature, characteristics, qualities, or geographic origin of . . . goods." Plaintiff alleges that defendants' representations that "(a) 'J.T. Leroy' exists, (b) the novel *Sarah* was authored by 'J.T. Leroy' and (c) *Sarah* is based on the personal, real-life experiences of its author constitute false advertising under § 43(a)(1)(B) of the Lanham Act." Am. Compl. ¶ 76. In large part, these allegations mirror the false authorship claims that *Dastar* precludes under § 43(a)(1)(A). Plaintiff nonetheless argues that *Dastar* leaves open the possibility that some false authorship claims could be vindicated under the auspices of § 43(a)(1)(B)'s prohibition on false advertising. *See Zyla v. Wadsworth*, 360 F.3d 243, 252 n. 8 (1st Cir.2004). In particular, plaintiff relies on the suggestion in *Dastar* that if the defendant in that case had substantially copied the public-domain video at issue and, "in advertising or promotion," had attempted "to give purchasers the impression that the video was quite different" from the public-domain work, the original producers of the public domain work "might have a cause of action . . . for misrepresentations under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)." *Dastar*, 539 U.S. at 38, 123 S.Ct. 2041.

■ However, while this language might be read to suggest that the Supreme

Court was leaving open the possibility of a claim arising from a misrepresentation going to the substance of a work, rather than the work's authorship, in the instant case, with respect to claims that sound in false authorship, the holding in *Dastar* that the word "origin" in § 43(a)(1)(A) refers to producers, rather than authors, necessarily implies that the words "nature, characteristics, [and] qualities" in § 43(a)(1)(B) cannot be read to refer to authorship. If authorship were a "characteristic[ ]" or "qualit[y]" of a work, then the very claim *Dastar* rejected under § 43(a)(1)(A) would have been available under § 43(a)(1)(B).

Accordingly, in its Order of November 29, 2006, this Court dismissed plaintiff's claims under § 43(a)(1)(B) of the Lanham Act against all defendants (again including the non-movant Farkas).

■ Defendant Bloomsbury also moved to dismiss Count III, which alleges fraud. Under New York law, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987). Under Rule 9(b), Fed.R.Civ.P., "the circumstances constituting fraud or mistake shall be stated with particularity," but "intent ... may be averred generally." Bloomsbury admits that plaintiff has adequately alleged that Bloomsbury made various fraudulent statements suggesting that J.T. Leroy was a real person who wrote the semi-autobiographical novel *Sarah,* Bloomsbury Mem. at 5 (citing Am. Compl. ¶ 56), but Bloomsbury argues that plaintiff has not adequately pleaded intent, reasonable reliance, or damages.

■ With respect to intent, plaintiff alleges that "Bloomsbury knew ... that the biography and life story of 'J.T. Leroy' that it was actively publicizing was not true." Am. Compl. ¶ 94. Plaintiff bases this assertion on a statement a former Bloomsbury editor made in an interview published in the magazine *Vanity Fair* in 2006 suggesting that the editor had suspected the J.T. Leroy hoax all along, *id.* ¶ 94.a, and on the fact that Bloomsbury placed a purported author photograph of J.T. Leroy on the back of *Sarah* and defendant Albert later said, in an interview published in the *Paris Review,* that Bloomsbury knew the photograph was not of J.T. Leroy, *id.* ¶ 94.b. Read in the light most favorable to plaintiff, these allegations, as well as defendant's alleged motive to defraud and its clear opportunity to do so, "constitute strong circumstantial evidence of conscious misbehavior or recklessness," and are therefore sufficient to "give rise to a strong inference of fraudulent intent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 187 (2d Cir.2004).

With respect to reliance, plaintiff alleges that plaintiff "justifiably relied upon the many and varied representations detailed herein, including without limitation those in publicity, advertisements, and other commercial statements, regarding *Sarah's* authorship and semi-autobiographical nature, along with 'J.T. Leroy's' personal history, notoriety, and identity, in determining to enter into an option contract to develop a film based on *Sarah.*" Am. Compl. ¶ 102. Bloomsbury argues that plaintiff's reliance was not reasonable, and that plaintiff did not rely on any of Bloomsbury's statements in particular. It is true as a general proposition that a plaintiff "will not be heard to complain that he was induced to enter into [a] transaction by misrepresentations" where the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation." *Crigger v. Fahnestock*

*and Co., Inc.,* 443 F.3d 230, 235 (2d Cir. 2006) (internal quotation marks omitted). But here, plaintiff has alleged that it investigated the truth behind Bloomsbury's various representations that a real person named J.T. Leroy was the author of the semi-autobiographical novel *Sarah* by, *inter alia,* reviewing an IRS Form W–9 purportedly signed by J.T Leroy, *id.* ¶ 40.a, meeting with a person purporting to be J.T. Leroy, *id.* ¶ 40.b, and communicating by phone, fax and email with the purported J.T. Leroy, *id.* ¶ 40.d. In these circumstances, plaintiff has adequately alleged reasonable reliance.

With respect to damages, plaintiff alleges that "[a]s a result of Defendants' deliberate and knowing misrepresentations, Antidote was induced to enter into an option contract and begin development of a film project based on *Sarah,*" and "Antidote would not have invested the resources it did in acquiring the option and developing a project had Defendants disclosed that *Sarah* was not semi-autobiographical and 'J.T. Leroy' did not exist." *Id.* ¶ 104. Plaintiff "has been, and continues to be, injured" because "[t]he option and the project are decreased in value, the director is no longer interested, financial backing and distribution are unlikely at best, and the investments to-date have been lost." *Id.* ¶ 105. Bloomsbury argues that the First Amended Complaint "lacks any allegation that Antidote's potential *Sarah*-based film would be profitable," which, it argues, is "the *sine qua non* of damages in this case." Bloomsbury Mem. at 5 n. 6. But regardless of whether any film version of *Sarah* would be profitable, plaintiff has adequately alleged damages flowing from plaintiff's decision to purchase the film option on *Sarah* and to invest various resources in developing that film in reliance on defendants' fraudulent statements.

Accordingly, the Court in its Order of November 29, 2006 denied Bloomsbury's motion to dismiss plaintiff's fraud claim.

■ Defendants Underdogs and Albert further moved to dismiss Count IV, which alleges negligent misrepresentation. Under New York law, a plaintiff alleging negligent misrepresentation must allege that "the defendant had a duty, as a result of a special relationship, to give correct information." *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000). Such a special relationship exists where defendants "possess unique or specialized expertise" or "are in a special position of confidence and trust with the injured party." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 788 (2d Cir. 2003).

Plaintiff here alleges that "Defendant Underdogs, by virtue of its contractual relationship and negotiations with Antidote for the option contract, and defendants Albert and Farkas, by virtue of their involvement in negotiations with Antidote, knew that Antidote was relying on the information about *Sarah's* author and 'his' personal history, and knew that those misrepresented facts were material in Antidote's consideration of whether or not *Sarah* was suitable material for development." Am. Compl. ¶ 108. Plaintiff alleges that "[t]his knowledge was sufficient to create a duty" on behalf of defendants "to disclose to Antidote the facts that 'J.T. Leroy' was not a real person and *Sarah* was not based on the real-life experiences of either 'J.T. Leroy' or its true author, Laura Albert." *Id.* In addition, Plaintiff alleges that defendants' "knowledge of the particular purpose to which Antidote was putting" information regarding "J.T. Leroy" and *Sarah,* created "a duty to ascertain and provide accurate information to Antidote, and Antidote had the right to

rely upon the information provided." *Id.* ¶ 110.

▮ But the mere fact that one party to a contract knows the particular purpose to which the other party is putting material information supplied by the first party—a situation common to most contracts—does not *ipso facto* create the "special position of confidence and trust," let alone a "unique or specialized expertise," that mandates a duty of care in ascertaining the truth of the disclosed information (in contrast to the duty to avoid intentional misrepresentations created by the law of fraud).

▮ Accordingly, the Court, in its Order of November 29, 2006, granted the motion filed by defendants Underdogs and Albert to dismiss plaintiff's claim of negligent misrepresentation against those defendants and also, for the reasons previously discussed, as against non-moving defendant Farkas.

▮ Next, defendants Underdogs and Albert moved to dismiss Count VII, which requests rescission of the option contract. Defendants argue that rescission is unavailable because (a) the option contract between the parties has expired, and (b) plaintiff did not exercise its right to rescission within a reasonable time of learning of defendants' alleged wrongdoing, but instead sought to extend the option. Defendants' first argument for dismissal—that the option expired—is, however, contradicted by plaintiff's allegation, which must be taken as true for purposes of this motion, that the option was renewed automatically by defendants' material breach of the contract. Am. Compl. ¶ 124. Defendants' second argument for dismissal—that plaintiff did not exercise its right to rescission within a reasonable time—similarly has no merit because, taking the allegations of the complaint in the light most favorable to

plaintiff, plaintiff did not delay unduly in bringing this action. The original option, which plaintiff purchased on July 21, 2003, lasted one year. *Id.* ¶ 39 & Ex. M. At the end of that year, plaintiff extended the option for an additional one-year period for an additional fee, and at the end of that year plaintiff extended the option again. *Id.* Per this second renewal, the option was set to expire on July 21, 2006. Am. Compl. Ex. M. Plaintiff sent a letter to defendants dated July 17, 2006 that informed defendants that the option would be automatically extended through July 21, 2007 because of defendants' material breach. Plaintiff filed the original complaint in this action on August 10, 2006. In these circumstances, plaintiff did not unduly delay in bringing its claim for rescission.

Accordingly, the Court, in its Order of November 29, 2006, denied the motion filed by defendants Underdogs and Albert to dismiss plaintiff's claim for rescission.

▮ Finally, defendants Underdogs and Albert moved to dismiss Count VIII, which alleges unjust enrichment. Defendants rely on *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987), which holds that "[i]t is impermissible ... to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.* at 389, 521 N.Y.S.2d 653, 516 N.E.2d 190. Defendants argue that the written option contract between them and plaintiff governs the dispute and that defendants fully performed the option contract by, in exchange for plaintiff's payment of $45,000, refraining from alienating their rights to *Sarah.* But in the light most favorable to plaintiff, the unjust enrichment claim alleges that

the written contract between the parties is invalid because it was procured by fraud and that defendants were unjustly enriched because they retained plaintiff's $45,000 in exchange for an option that had no value. Am. Compl. ¶¶ 154–156.

Accordingly, the Court, in its Order of November 29, 2006, denied the motion filed by defendants Underdogs and Albert to dismiss plaintiff's claim of unjust enrichment.

For the foregoing reasons, the Court reconfirms its Order dated November 29, 2006 in all respects. The claims remaining in this case are Count III against all defendants and Counts V, VI, VII, and VIII against defendants Underdogs and Albert. The Clerk of the Court is hereby directed to close documents 22, 26 and 28.

SO ORDERED.