*177
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal requires application of the Uniform Commercial Code to a dispute over the alleged breach of an agreement for the sale of high density polyethylene (HDPE) between two dealers in chemical compounds — plaintiff-seller, CT Chemicals (U.S.A.), and defendant-buyer, Vinmar Impex.
 

 The events in issue — largely an exchange of telexes and other documents — took place during a six-month period beginning October 1986. On October 28, Vinmar by telex to CT memorialized its oral offer to buy 1,000 metric tons of HDPE, stating that payment was to be by letter of credit. The next day, CT sent Vinmar written confirmation that CT would ship
 

 1.000 metric tons in November, with payment by irrevocable letter of credit. CT, that same day, also sent a telex confirming the terms as stated on its sales confirmation, and offering Vinmar an additional 1,000 metric tons on the same terms and conditions. On October 31, Vinmar acknowledged receipt of CT’s confirmation of the sale of 1,000 metric tons, but made no mention of the additional amount.
 

 Vinmar alleges that some time in November, the parties orally agreed to change the payment method from irrevocable letter of credit to "net 30 days,” or 30 days’ credit. CT disputes that such an agreement was made.
 

 On November 24, 1986, Vinmar sent CT a purchase order form for 1,000 metric tons, filled out to reflect delivery in November/December and payment "Net 30” days.
 

 Vinmar two weeks later expressed concern about CT’s plans to market HDPE as a competitor and purported to cancel its order. However, the parties soon thereafter agreed to continue with the contract, as evidenced by an exchange of telexes in mid-December, rescheduling shipment of 1,000 metric tons to January 1987. These communications also reflected that CT’s offer to sell Vinmar an additional 1,000 metric tons of HDPE remained outstanding.
 

 On January 9, Vinmar telexed CT instructions for shipping 1.000 metric tons and acceptance of the offer for the second quantity, which CT was to place on the purchase order sent for the first 1,000 metric tons. Four days later CT telexed confirmation that the initial contract was amended to state a purchase of 1,900/2,000 metric tons, with delivery in January/ February 1987 and all other terms and conditions unchanged. CT then sent Vinmar an amended sales confirmation stating
 
 *178
 
 it would ship 1,900/2,000 metric tons with delivery in January/February and payment by irrevocable letter of credit.
 
 *
 

 In January and February 1987, the parties exchanged several communications addressing the mechanics of both the letter of credit and the first shipment. Notably, Vinmar’s documents indicate no objection to the letter of credit. In fact, on January 28, Vinmar sent CT a copy of a proposed letter of credit in the amount of $510,000 — the agreed price for 1,000 metric tons — and on February 6, opened that letter of credit with Barclays Bank.
 

 CT then shipped 1,000 metric tons of HDPE and later in the month Vinmar authorized shipment of the second amount. Due to the following events, however, the second shipment was never made.
 

 On February 25, 1987 the first shipment arrived, and was accepted by Vinmar’s customers. That same day, CT made presentment to Barclays Bank for payment under the terms of the letter of credit. However, the bank could not confirm that it would honor the letter of credit, and Vinmar refused to waive the discrepancies. In an exchange of telexes, CT declined to ship the second lot until the payment problem was resolved. On March 30, Barclays formally rejected CT’s presentment, stating that on the advice of Vinmar, payment would be handled "outside of the L/C terms.” CT demanded payment, Vinmar did not comply, the second shipment was never sent, and this lawsuit ensued.
 

 The parties submitted a CPLR 3031 joint statement in lieu of pleadings containing claims by CT and counterclaims by Vinmar. Supreme Court denied cross motions for summary judgment, concluding there was a material factual issue with regard to when payment was due. The Appellate Division modified to grant plaintiff summary judgment in the amount of $710,000 (reduced to $510,000 upon reargument). We granted leave and now affirm.
 

 At the outset, we note that this dispute between merchants implicates several provisions of article 2 of the Uniform Commercial Code, which propounds clear sensible rules grounded in the reality of commercial transactions
 
 (see,
 
 UCC 2-101, comment).
 

 
 *179
 
 Contrary to defendant’s contention, this case does not present a classic battle of forms — "the all too common business practice of blithely drafting, sending, receiving, and filing unread numerous purchase orders, acknowledgments, and other diverse forms containing a myriad of discrepant terms”
 
 (Matter of Marlene Indus. Corp. [Carnac Textiles],
 
 45 NY2d 327, 329-330). In such situations, UCC 2-207 governs whether a contract has been formed, and if so its terms
 
 (see, Marlene Indus.,
 
 45 NY2d, at 332; 1 White and Summers, Uniform Commercial Code § 1-3, at 28-29 [3d ed]).
 

 Here, the parties do not dispute the formation of a contract or the original terms: by virtue of the exchanges between Vinmar and CT in October 1986, a contract was formed for the sale of 1,000 metric tons of HDPE for delivery later that year, with payment by irrevocable letter of credit. Clearly also, this contract was later modified to double the quantity of HDPE and defer delivery to January/February 1987.
 

 Disagreement centers on two alleged modifications — first, whether the payment method was changed from letter of credit to 30 days’ credit and second, whether the new quantity was to be delivered as one shipment or two (which then determines when payment was due). We conclude that payment was to be by letter of credit, that two shipments were contemplated with payment due after the first, and that Vinmar — the buyer — therefore was correctly identified by the Appellate Division as the defaulting party.
 

 Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel. In order to determine the terms of such change, we look to UCC 2-208 and 2-209, not 2-207
 
 (see generally,
 
 1 White and Summers, Uniform Commercial Code § 1-3, at 36-37, n 22; § 1-6, at 57).
 

 Vinmar claims there was an express oral modification of the original payment method — letter of credit — to provide for payment on 30 days’ credit. However, that issue need not be reached, for the parties’ course of conduct makes abundantly clear that there was no modification of the payment term.
 

 Where a contract involves repeated occasions for performance and opportunity for objection "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement” (UCC 2-208 [1]). "[S]uch course of performance shall be relevant to
 
 *180
 
 show a waiver or modification of any term inconsistent with such course of performance” (UCC 2-208 [3]). This section recognizes that the "parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was” (UCC 2-208, comment 1).
 

 Faced with repeated occasions to object during January and February, Vinmar chose instead to honor its obligation to furnish a letter of credit. We therefore conclude, based on the course of performance, that the modified contract required payment by letter of credit (UCC 2-208).
 

 We reach a similar conclusion as to the time payment was due, an issue that turns on whether delivery was severable. The contract itself does not address this issue, and we therefore look to the UCC to fill in the term (UCC 2-204 [3]; and comment). The UCC has a specific provision with regard to delivery in lots: "Unless otherwise agreed all goods called for by a contract for sale must be tendered in a single delivery and payment is due only on such tender but where the circumstances give either party the right to make or demand delivery in lots the price if it can be apportioned may be demanded for each lot” (UCC 2-307).
 

 Vinmar contends that it was entitled to delivery of the 2,000 metric tons in one lot and that payment was not due until the full amount was received, but again its actions belie that argument. The parties’ correspondence in January and February 1987 demonstrates that, while they discussed the possibility of collapsing delivery into one lot, the two amounts were always spoken of as severable. Indeed, the letter of credit Vinmar actually set up covered only the first 1,000 metric tons, indicating that the second 1,000 metric tons would be paid for separately. As the Appellate Division concluded, these actions constitute "circumstances” confirming CT’s right to make delivery in two lots and demand separate payment for each lot (UCC 2-307), and it had a right to payment for 1,000 metric tons as of the date that shipment was delivered.
 

 Even if payment was due upon delivery of the first shipment, Vinmar contends that the letter of credit suspended its obligation to pay.
 

 Again, the UCC provides the answer: "The delivery to seller of a proper letter of credit suspends the buyer’s obligation to pay. If the letter of credit is dishonored, the seller may on seasonable notification to the buyer require payment directly
 
 *181
 
 from him” (UCC 2-325 [2]). Whether Vinmar set up a "proper” letter of credit is a factual question, but one we need not reach. Once the bank notified CT of problems with the letter of credit, CT had the right to demand assurances that Vinmar would waive any discrepancies and to suspend further performance until such assurances were forthcoming
 
 (see,
 
 UCC 2-609 [1] ["When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return”]). CT did just that.
 

 Furthermore, when the bank formally notified CT that the letter of credit would be dishonored, under UCC 2-325 (2) CT had the right to demand payment from Vinmar, and in fact did so. Vinmar’s refusal to make payment constituted a breach of the contract, entitling CT to withhold the second shipment
 
 (see,
 
 UCC 2-703 ["(w)here the buyer wrongfully * * * fails to make a payment due * * * then also with respect to the whole undelivered balance, the aggrieved seller may (a) withhold delivery of such goods”]).
 

 Vinmar insists that, prior to paying for the first shipment,
 
 it
 
 had the right to demand adequate assurances that the second shipment would be sent because it had reason to believe CT would not be able to make the second shipment and that absent such assurances, it had no obligation to pay. We disagree. While CT did not receive the agreed return for the first shipment, Vinmar had the goods and therefore was not entitled to suspend payment.
 
 Created Gemstones v Union Carbide Corp.
 
 (47 NY2d 250, 255) is inapposite, as that case presented a factual issue that does not exist here — whether the seller had breached the contract.
 

 Finally, since there was no dispute that the contract price for the 1,000 tons shipped was $500 per metric ton, we see no basis for disturbing the award of $500,000 plus incidental damages.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Simons, Titone, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
 

 Order affirmed, with costs.
 

 *
 

 Vinmar holds a copy of the January 13, 1987 sales confirmation with the words "confirmed irrevocable letter of credit” crossed out, and
 
 a
 
 handwritten "net 30” added. There was no evidence, however, that this was ever sent toCT.