**In re DOCTORS HOSPITAL OF HYDE PARK, INC., Debtor.**

**Doctors Hospital of Hyde Park, Inc., Plaintiff,**

**v.**

**Dr. James H. Desnick, et al., Defendants.**

**Bankruptcy No. 00 B 11520.**
**Adversary No. 02 A 00363.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 25, 2007.

Jeffrey L. Gansberg, John Costello, John E. Frey, Wildman, Harrold, Allen &

Dixon, Chicago, IL, Scott A. Semenek, for Plaintiff.

Gus A. Paloian, Seyfarth, Shaw, Chicago, IL, trustee.

Michael D. Warner, Simon Warner & Doby LLP, Fort Worth, TX, Adam P. Silverman, Howard L. Adelman, Adelman & Gettleman, Ltd., Chicago, IL, for LaSalle Bank National.

David J. Tecson, Michael N. Ripani, Chuhak & Tecson, Chicago, IL, for Michael Nelson.

Jane B. McCullough, Kimberly M. DeShano, Nancy A. Peterman, Greenberg Traurig PC, Chicago, IL, for Asset Securitization Corporation/Nomura Asset Capital Corporation.

Kathryn M. Gleason, Office of U.S. Trustee, Chicago, IL.

Lewis T. Stevens, Michael Warner, Warner Stevens LLP, Fort Worth, TX, for LaSalle Bank.

James M. Witz, Frances Gecker, Freeborn & Peters, Chicago, IL, for Stephen Weinstein.

David Audley, Michael T. Benz, Richard Wohlleber, Chapman and Cutler LLP, for LaSalle Bank N.A.

John L. Conlon, Robert D. Nachman, Schwartz Cooper Greenberger & Krauss Cht., Chicago, IL, for James H. Desnick.

Neville N. Reid, Mayer Brown Rowe & Maw, LLP, Chicago, IL, for Unsecured Creditors Committee.

Janine M. Garguilo, William J. McSherry, Jr., Arent Fox Kinter Plotkin & Kahn, PLLC, New York City.

Peter Isakoff, Weil, Gotshal & Manges, LLP, Washington, DC.

Michael J. Kralovec, Joseph R. Lemersal, Sara J. Rowden, Nash, Lalich & Kralovec, Chicago, IL, for Robert Krasnow.

Gary J. Cruciani, Charles W. Cunningham, David Sochia, McKool Smith, Dallas, TX.

Margaret H. Weging, Law Offices of Jeffery M. Leving, Ltd., Chicago, IL.

## *ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW*

(Counts VIII, IX, X ("LaSalle Counts"))

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to Counts VIII, IX, and X of the case filed by Debtor Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital") under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. It is now being pursued by the Chapter 11 Trustee in those Counts against LaSalle Bank N.A., f/k/a LaSalle National Bank as Trustee for Certificate holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D–5 ("Defendant," "Trust," or "LaSalle Trust").

Following trial, all parties having rested, Findings of Fact and Conclusions of Law were made and entered herein on March 2, 2007 ("Findings and Conclusions"). 360 B.R. 787 (Bankr.N.D.Ill.2007). On March 23, 2007 the following Amended Final Judgment ("Judgment") was entered pursuant to the Findings and Conclusions:

1. On Count VIII of the Complaint, judgment was entered in favor of Plaintiff (now the Chapter 11 Trustee of the bankruptcy estate of Debtor Doctors Hospital) ("Plaintiff") and against Defendant declaring void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement (all as defined in Exhibit A appended to the Judgment); (b) declaring void any lien or any assets of Doctors Hospital created by or arising from the voided documents, including but not limited to any lien in or to the pro-

ceeds realized from sale of assets of Doctors Hospital that formed collateral associated with the voided documents and any lien in or to any other assets or their proceeds of Doctors Hospital or the bankruptcy estate that formed collateral associated with the voided documents.

2. On each of Counts IX and X of the Complaint, judgment was entered under 11 U.S.C. § 550 *in favor of Plaintiff* and against Defendant in the principal amount of $2,668,746.35 as the total of rent paid in excess of market rate of rental prior to July of 1998, plus pre-judgment interest thereon in the amount of $1,672,492.08, for a total of $4,341,238.43 with post-judgment interest to accrue on the entire total judgment in accordance with provisions of 28 U.S.C. § 1961. Collection on either dollar judgment entered in Count IX or Count X is to be credited against the dollar judgment entered in the other Count.

3. On Count IX of the Complaint, judgment was entered in favor of Defendant on Plaintiff's prayer to void the Lease (as defined in Exhibit B appended to the Judgment Order) and on Plaintiff's prayer for additional recovery of lease payments.

Following entry of Judgment, the Defendant filed a Motion to Alter, Amend and Reopen Judgment pursuant to Bankruptcy Rule 9023 ("Defendant's Motion to Amend"). The Defendant's Motion to Amend first seeks to amend and reopen the Judgment as to Counts IX and X so that new Findings and Conclusions can be made and entered to specify that the pre-July 1998 payments made by Doctors Hospital were payments of "debt" rather than "rent." In a certain post-trial filing, Plaintiff expressly abandoned any right to recovery of Nomura Loan payments. Defendant argues in its Motion to Amend that if the pre-July 1998 payments are determined to be payments of "debt" and not payments of "rent," it follows that a new judgment should be entered denying recovery against Defendant for the excess rent since Plaintiff abandoned his claims to recovery of debt payments.

The Defendant also seeks to amend and reopen the Findings and Conclusions to specify that the pre-July 1998 payments found to be excess rent were passed through to the Certificate holders by Defendant. Defendant argues that this would compel the conclusion that Defendant was not the initial transferee of the pre-July 1998 payments under § 550 of the Bankruptcy Code but rather was a "conduit" or financial intermediary. Thus, according to Defendant, it should follow that a new judgment should be entered denying money damages against Defendant, since Defendant would not then be liable for money damages under § 550 of the Bankruptcy Code.

The Plaintiff also filed a Motion to Alter and Amend Judgment ("Plaintiff's Motion to Amend"). Plaintiff argues therein and in his briefs that the Findings and Conclusions should be amended to conclude that Doctors Hospital was the true borrower on the Daiwa Loan. Therefore, Plaintiff argues it should follow that the post-July 1998 rent transfers were transfers of Debtor assets, that they were fraudulent transfers to the extent of being rent in excess of market rate, and that Plaintiff is entitled to judgment under 11 U.S.C. § 550 for the excess rent attributable to those post July 1998 transfers, thereby substantially increasing the Plaintiff's recovery.

The following briefs were filed in support of and response to the foregoing motions:

1. Defendant's Memorandum in Support of Motion to Alter, Amend and Reopen Judgment Pursuant to Bankruptcy Rule 9023 filed on April 13, 2007

2. Plaintiff's Memorandum in Opposition to Defendant's Motion to Alter, Amend and Reopen Judgment Pursuant to Bankruptcy Rule 9023 filed on April 27, 2007
3. Defendant's Reply Memorandum in Support of Motion to Alter, Amend and Reopen Judgment Pursuant to Bankruptcy Rule 9023 filed on May 4, 2007
4. Plaintiff's Memorandum in Support of Plaintiff's Motion to Amend Findings of Fact and Conclusions of Law filed on April 13, 2007
5. Defendant's Memorandum in Response to Plaintiff's Motion to Amend Findings of Fact and Conclusions of Law filed on April 27, 2007
6. Plaintiff's Reply Memorandum in Support of Motion to Amend Findings of Fact and Conclusions of Law filed on May 4, 2007
7. Plaintiff's Sur-Reply brief filed on June 26, 2007
8. Defendant's Sur-Response brief filed on July 16, 2007

Neither party sought to offer additional evidence, and all arguments were based on the trial record. Both parties are essentially rearguing evidence and legal issues already analyzed following trial, with some new arguments thrown in to support contentions that there were errors in the earlier Findings and Conclusions.

For reasons stated in the original Findings of Fact and Conclusions of Law and for additional reasons stated below which will stand as Additional Findings of Fact and Conclusions of Law, Plaintiff's Motion to Amend and Defendant's Motion to Amend will each be denied and the Judgment will stand as entered.

## *PLAINTIFF'S MOTION TO AMEND AND ALTER JUDGMENT*

### I. *MMA Funding Was the Borrower on the Daiwa Loan and Transfers to the Trust Were Not Transfers of Debtor's Property*

■ The Plaintiff's Motion to Amend seeks amendment of the Findings and Conclusions and consequent expansion of the Judgment on Counts IX and X to include excess rent paid after July, 1998, based on one issue:

> The issue is whether excess rent payments to the Trust after July 7, 1998, were property of the Debtor. Plaintiff's legal theory is that the payments became property of the Debtor because the parties to the Daiwa Loan transaction modified their agreement by post-contract conduct so that Doctors Hospital became the borrower on the Daiwa Loan.

(Mem. in Supp. of Pl.'s Mot. to Amend 2.)

As discussed below, Doctors Hospital never became the borrower through "conduct" or any contract change. Therefore the post July 1998 rent payments were not transfers of Debtor's assets and therefore were not fraudulent transfers.

Plaintiff argued, in an attempt to show that Doctors Hospital acted as and became borrower under the Daiwa Loan, that MMA Funding only had a limited role as a special purpose entity. Plaintiff argues that because MMA Funding did not perform each and every one of its permitted functions under its Operating Agreement, it should not be treated as a separate entity. However, the following was already observed in the original Findings and Conclusions:

> MMA Funding was not an operating company. Robinson (the manager of Doctors Hospital) acknowledged that it was never intended to be an operating

company. (Tr. II, p. 24.) However, its lack of operations (and functions related to operations) does not mean that its corporate form should be ignored. In the same way, the absence of separate financial statements and tax returns for MMA Funding after the closing date of the Daiwa Loan do not warrant disregarding the separateness of Doctors Hospital and MMA Funding. The trial record reveals that both Daiwa and Nomura relied on the separateness of these entities. MMA Funding was created as a functional vehicle and performed its intended function. Its function was to serve as a bankruptcy-remote entity and vehicle for transmission of a cash flow from it to Daiwa. The fact that it was not making widgets does not mean that its separate function should be ignored.

*Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 852 (Bankr.N.D.Ill. 2007).

Plaintiff argues that in the Findings and Conclusions, an incorrect legal standard was applied to his contention that various documents and conduct transformed Doctors Hospital into the borrower. In his Memorandum in Support of Plaintiff's Motion to Amend, Plaintiff identifies what he believes to be the proper legal standard and argues that the evidence at trial demonstrated that the Daiwa Loan Agreement was modified by conduct of the parties to substitute Doctors Hospital for MMA Funding as the actual borrower. In short, it is argued that the party identified by loan documents as borrower and obligor on a major financial transaction was changed "by post contract conduct" to substitute an entirely different party without any need to amend or revise the documents to effect such a change. However, the evidence relied on to justify that result did not establish by preponderance of evidence or logic that the parties through conduct substituted a new borrower for the designated borrower, and the cited precedent does not at all support the argument.

In the original Findings and Conclusions, it was found that post-July 7, 1998, the parties acted in accordance with the transaction documents which are fully integrated, unambiguous documents. *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 847 (Bankr.N.D.Ill.2007). It was stated, "Doctors Hospital argues that as a court of equity, this Court should look behind the form of the transaction and relationships to determine the substance of the transaction. To do so, however, would ignore the unambiguous loan documents and the parties reliance thereon." *Id.*

The parties agreed, and the original Conclusions held, that law of the State of New York applies to the transactions in issue.

Under New York law, "[a] contract is unambiguous if it possesses a 'definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself,' and no reasonable basis for a difference of opinion exists." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.),* 336 B.R. 39, 50 (Bankr.S.D.N.Y.2006) (citing *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Plan,* 7 F.3d 1091, 1095 (2d. Cir.1993)). The Daiwa Loan documents were not ambiguous; they clearly stated that MMA Funding was the borrower, not Doctors Hospital.

Prior to trial in this case, the Defendant moved for summary judgment. A Memorandum Opinion was entered in response to that motion, in which this Court opined:

> "[I]t is well established that a written contract may be modified by the parties' post-agreement course of performance."

*General Electric Capital Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd.*, 246 A.D.2d 41, 52, 675 N.Y.S.2d 626 (N.Y.App.Div.1998); *Recon Car Corp. of N.Y. v. Chrysler Corp.*, 130 A.D.2d 725, 729, 515 N.Y.S.2d 829 (N.Y.App.Div.1987); *CT Chems. (U.S.A.) Inc. v. Vinmar Impex Inc.*, 81 N.Y.2d 174, 179–80, 597 N.Y.S.2d 284, 613 N.E.2d 159 (1993). Parol evidence can be considered to determine course of dealing and course of performance between parties. *Big Tree Energy Partners v. Bradford*, 219 A.D.2d 27, 640 N.Y.S.2d 270 (N.Y.App.Div.1996).

*Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 336 B.R. 357, 366 (Bankr.N.D.Ill. 2005).

Plaintiff argues that the above constitutes the correct statement of the New York legal standard on the "course of performance" issue (as to whether such performance modified the written contract in this case) and as such, that opinion represents the "law of the case" binding both the parties and the court at trial. (Mem. in Supp. of Pl.'s Mot. to Amend 7.)

The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citing *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). The law of the case doctrine only applies where a court actually decided the issue in question. *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir.2007). However, in the Memorandum Opinion denying summary judgment, the issue in question was not decided. Rather, it was only decided that "a rational fact finder cannot at this state say that the non-moving party is wrong on this issue, and a material fact is in dispute regarding who should be treated as the borrower under the Daiwa Loan." *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 336 B.R. 357, 366 (Bankr.N.D.Ill.2005).

In any event, the principles and precedent cited in the Findings and Conclusions were not inconsistent with that cited in the Memorandum Opinion denying summary judgment. That Opinion noted under New York precedent that in appropriate circumstances contracts can be modified by the parties' course of performance.

But following trial it was found and concluded that evidence did not support such a ruling here. The beginning of analysis on this issue is that "[i]f a contract is unambiguous on its face, a court must give effect to the contract as written and may not consider extrinsic evidence to evince the parties' intentions." *Nisselson v. Empyrean Inv. Fund (In re MarketXT Holdings)*, 336 B.R. 39, 58 (Bankr.S.D.N.Y. 2006) (citing *Bernstein Mgmt. Corp. v. Petker & Buran Fur Corp.*, 201 B.R. 861, 863 (S.D.N.Y.1996)).

Moreover, Plaintiff's cited precedents do not support the argument. Plaintiff cited four New York cases which he argues confirm his view that contractual modification by subsequent performance is not precluded by the absence of an ambiguous contract. According to Plaintiff, in light of the cited New York cases and previous statements in the Opinion denying summary judgment, the Findings and Conclusions should be amended to conclude that Doctors Hospital was the true borrower on the Daiwa Loan. However, all of those cases cited can be easily distinguished from facts of this case.

In *Time Warner Cable v. City of New York*, a reinsurance case, the parties' dis-

pute centered on interpretation of the term "commercial" in a franchise agreement. 943 F.Supp. 1357, 1389 (S.D.N.Y. 1996). While the parties agreed that the language in the franchise agreement was facially unambiguous, they offered competing interpretations of the language. *Id.* at 1390. Therefore, the court decided to "rely on parol evidence not to vary or add to the terms of the contract, but only to interpret and give effect to the parties' intent." *Id.* It was not held that in light of an unambiguous contract the parties course of performance should nonetheless be considered to determine whether the contract should be modified. Rather, after finding that the language was open to different interpretations, the court considered parol evidence not to vary the terms of the contract but only to determine the parties' intent.

The dispute in *Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Co.* arose where an insurance company provided for radioactive contamination coverage, but failed to notify the reinsurer of such a provision. 75 N.Y.2d 295, 301, 552 N.E.2d 139, 142, 552 N.Y.S.2d 891, 894 (1990). Defendant reinsurer therefore argued that Sumitomo's alleged failure to disclose this material fact entitled it to rescission of the contract. *Id. Sumitomo* was not a case in which a party argued for the modification of a contract; rather the dispute focused on a party's failure to disclose material terms of contract. Also, the Opinion noted that *Sumitomo* dealt with reinsurance law—"a field in which differences have often been settled by handshakes and umpires ..." *Id.* at 298, 552 N.Y.S.2d 891, 552 N.E.2d 139.

In *Arkwright–Boston Mfg. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, also a reinsurance case, a dispute existed as to whether a premium payment to an agent of an insurance company was proper. No. 86 Civ. 3898, 1987 WL 14466, at *1 (S.D.N.Y. July 14, 1987). It was noted, "The policy includes no express provisions making P & B the agent of the insurer to receive premiums from Arkwright." *Id.* at *4. Therefore, it was held that "[e]xtrinsic evidence such as course of dealing, course of performance, trade usage and custom is required to determine the parties' intent." *Id.* The court found it necessary to utilize extrinsic evidence because the insurance policy was not clear. In contrast, the contract involved in this case is very clear in showing that MMA Funding was borrower under the Daiwa Loan.

Finally, in *United Fire and Casualty Co. v. Arkwright Mut. Ins. Co.*, another reinsurance case, a dispute arose over whether extended policy coverage existed when it was never mentioned in subsequent documentation or communication between the parties. 53 F.Supp.2d 632, 638 (S.D.N.Y.1999). The court stated, "When a contract is in any respect uncertain or unequivocal in meaning, all the circumstances leading to its execution may be shown for the purpose of clarifying, but not of contradicting or changing its terms." *Id.* (citations omitted). In addition, it was found that "the parties' course of performance of a contract is relevant to understanding the contract even if the contract is unambiguous," *Id.* (citations omitted), a comment made relevant to reinsurance issues and practices.

The reinsurance cases cited by the Plaintiff for support "present particular issues of contract construction, due to the 'swift, seemingly almost casual process of contract formation' unique to the reinsurance industry." *EJ Footwear, LLC v. Excellus Health Plan, Inc.,* No. 3:05–0504, 2006 WL 2265463, at *7 (M.D.Tenn. Aug.8, 2006) citing *Sumitomo Marine and Fire Ins. Co. v. Cologne Reinsurance Co. of America,* 75 N.Y.2d 295, 302, 552 N.Y.S.2d

891, 552 N.E.2d 139, 142 (1990). The particular issues that arise in reinsurance cases do not apply to case at bar, in which standard commercial loan documents were evidenced.

Most critical, authority in this area does not hold that identity and liability of a borrower under a lending contract can be changed based on course of performance of the parties without amendment of the loan documents, nor does any authority cited by Plaintiff support that theory. Allowing such would be an extraordinary remedy, an amazing and apparently unprecedent rewrite of a loan agreement. Changing the borrower under a contract is not the same as interpreting ambiguous language in a contract by looking at the parties' course of performance. Rather, the named borrower is a pivotal party to the loan, and defines the party liable to repay the loan.

In short, Plaintiff's argument on this point is not supported by logic, law, or persuasive evidence that a change of borrower was intended or effectuated.

## II. *The Daiwa Loan Provided That Any Modification Would Only Be Effective If in Writing*

Section 8.4 of the Daiwa Loan Agreement provided:

> Section 8.4. Modification, Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note or any other Loan Document, or consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Three amendments to the Daiwa Loan Agreement were entered into on August 21, 1997, August 26, 1997, and February 25, 1999 (the "Amendments"). (Findings and Conclusions ¶ 74; Jt. Exs. 2, 3, 4.) Each amendment was signed by MMA Funding. (Findings and Conclusions ¶ 74.) Doctors Hospital was not a signatory to any of these amendments. *Id.* None of the Amendments mentioned, acknowledged or sought to memorialize any oral or "course of conduct" understandings between the parties. To the contrary, each of the Amendments ratified and confirmed the Daiwa Loan Agreement and redefined it to comprise both the original agreement and the particular amendment being entered into. (Jt. Ex. 2, ¶ 2; Jt. Ex.3, ¶ 2; Jt. Ex. 4, ¶¶ 6–7.)

Section 8.4 of the Daiwa Loan Agreement specified how it was to be amended, and that is precisely how the parties did amend it on three occasions. The "course of performance" between parties in this case that is actually relevant to the point in issue was regular compliance with the requirements of Section 8.4 requiring amendments to be reduced to writing.

Additionally, New York General Obligations Law § 15–301 provides in relevant part, "A written agreement which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the parties against whom enforcement is sought." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 708 F.Supp. 612, 613 (S.D.N.Y.1989) (citing N.Y. McKinney's General Obligations Law § 15–301, subd. 1). The purpose of this

statute is to assure the authenticity of an amendatory agreement; thus, the law requires formal writing to insure the validity and genuineness of a contractual modification. *DFI Commc'n Inc. v. Greenberg,* 41 N.Y.2d 602, 606, 363 N.E.2d 312, 315, 394 N.Y.S.2d 586, 589–90 (N.Y.1977). Generally, a written agreement expressly stating that it can be modified only in writing cannot be modified orally. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir.1990); *Pinky Originals, Inc. v. Bank of India,* No. 94 Civ. 3568, 1996 WL 603969, at *16 (S.D.N.Y. Oct. 21, 1996).

There are two exceptions recognized to this general principle. First, "an oral modification may be enforced when there has been partial performance of the agreement to modify, so long as the partial performance is 'unequivocally referable to the oral modification.'" *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir.1990). "Second, when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that the modification be in writing." *Id.*

In this case, no oral agreement was proven to modify the loan documents so as to substitute Doctors Hospital as borrower. The evidence did not establish that any representative of either party to the loan transaction orally agreed or even proposed to modify the loan documents to change the borrower. As earlier noted Plaintiff did not establish by preponderance of evidence any conduct that the parties acted in some way to modify the contract so as to change the borrower and obligor under the loan.

In fact the parties did not modify the lending contract by their conduct or any agreement in this regard. Rather, they acted in accordance with the transaction documents which are fully integrated, unambiguous documents.

### III. *Seventh Circuit and District Court Holdings in Other Proceedings*

Plaintiff asserts that prior opinions of a Seventh Circuit panel and a District Judge have recognized that Doctors Hospital was the borrower on the Daiwa Loan. Plaintiff cites to portions of dicta in two opinions for support. The first is from an unreported memorandum opinion by a District Judge: "On March 31, 1997, Daiwa Healthco–2 LLC, an affiliate of Daiwa Bank ('Daiwa'), entered into a complex loan transaction in which, among other things, it loaned approximately $23 million to Doctors Hospital." *LaSalle Bank Nat'l Ass'n v. Doctors Hosp. of Hyde Park, Inc. (In re Doctors Hosp. of Hyde Park, Inc.),* No. 04 C 4319, 2005 WL 1766370, at *2 (N.D.Ill. July 21, 2005). It was later noted by a Seventh Circuit panel opinion in dicta that, "Because the loan was, in practical effect, a loan to the Hospital, the Hospital secured the loan by pledging its receivables." *In re Doctors Hosp. of Hyde Park, Inc.,* 474 F.3d 421, 424 (7th Cir. 2007). The issue in both cases was whether a settlement with Desnick and other defendants was in the best interests of the estate. In neither opinion wherein those comments appear was the opining court faced with the task of deciding the presently asserted contract modification issue.

However, that issue was directly before this Court which conducted a full trial on the merits. After both parties presented evidence, it was and remains determined that the unambiguous loan documents were not in fact modified by performance or conduct or agreement to change the borrower under the loan. That issue was neither presented to nor decided by the District Court Judge or the Seventh Circuit panel cited. Therefore, the cited snip-

pets of narrative *dicta* made by the District Court Judge and the Seventh Circuit panel do not determine or even provide relevant guidance for the ruling in this case.

### IV. *Defendant is not Seeking to "Enforce" the Daiwa Agreement*

In Plaintiff's Reply Memorandum in Support of Motion to Amend, Plaintiff argues for the first time that Defendant lacks the right to "enforce" the Daiwa Agreement based on New York law. "Under New York law there is well-settled principal that a third party cannot enforce a contractual obligation which is not clearly intended to benefit that party." (Pl.'s Reply Mem. in Supp. of Mot. to Amend 5) (citations omitted). In short, a party cannot claim to be a third-party beneficiary to a contract unless the contract so provides.

[9, 10] New York law does follow the rule that a third party may sometimes enforce a promise made for its benefit though it is a stranger both to the contract and to the consideration paid, provided that the contract was by its express terms made for benefit of the third party. 22 N.Y. Jr.2d Contracts § 302 (2007). A party seeking the status of a third-party beneficiary under a contract has the burden of proving that it has enforceable rights thereunder. *Id.*

But, that point is entirely irrelevant here. Defendant in this case is not seeking to "enforce" the provision in the Daiwa Loan requiring all amendments to be in writing because it is not seeking to enforce any promises made for its benefit. Defendant is instead requesting a reading of the contract according to its terms and the evidence presented. It is not barred under New York law from doing so because of limits on third party beneficiaries to their rights to enforce contract terms established for their benefit.

## *DEFENDANT'S MOTION TO AMEND AND ALTER JUDGMENT*

### I. *The Pre-July 1998 Transfers Were Payments of Rent*

In the Defendant's Motion to Amend, Defendant seeks to amend and reopen the Judgment on Counts IX and X pursuant to Bankruptcy Rule 9023 so that new findings and conclusions can be made providing that the pre-July 1998 payments by Doctors Hospital were payments of "debt" (which Plaintiff has waived its claims for) instead of "rent." According to Defendant, the Findings and Conclusions did not justify the conclusion that the pre-July 1998 payments made by Doctors Hospital were properly characterized as rent.

It was indeed held in the original Findings and Conclusions that the Trust was initial transferee of rent payments made by Doctors Hospital pursuant to the Lease during the period prior to July 1998. *Doctors Hosp. of Hyde Park v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, *838 (Bankr.N.D.Ill.2007). In addition, it was concluded that prior to that date funds from Doctors Hospital's general operating account were "used to make various payments, including rent payments to the Trust." *Id.* at 842. It was also found and held that Doctors Hospital paid rent for fiscal years 1998 and 1999 the respective sums of $5,668,658 and $5,669,459. *Id.* at 807. The rent, on a net basis, equaled the debt service payment owed by HPCH to the Trust under the Nomura Loan. *Id.* (citing Jt. Ex. 158.) The rent payments "were used to service HPCH's debt and other obligations under the Nomura Loan until July 1998" and "the Trust accepted them as payments on the Nomura Loan." *Id.* at 811, 815.

The reasons for finding and concluding that the pre-July 1998 payments constitut-

ed rent were explained in original Findings and Conclusions and are amplified below.

A. *The Cash Flow System Implemented by the Trust*

When viewed as a whole, the cash flow structure imposed by the Trust on HPCH and Doctors Hospital makes it impossible to characterize Doctors Hospital's payments to the Cash Collateral Account as anything other than rent. The Nomura Loan transaction documents mandated a cash flow system that dictated the movements of rent payments into the Cash Collateral Account controlled by the Trust. (Jt. Exs. 11, 73, 89.) The cash management provisions of the Nomura Loan provided that HPCH would direct Doctors Hospital to "deposit all lease payments" under the Lease into the Collection Account (entitled "Nomura Asset Capital as Mortgagee of HPCH, LLC") and direct the Collection Account Bank to transfer all funds in the Collection Account to the Cash Collateral Account. (Jt. Ex. 11 ¶ 2.12(a)-(b).)

The Nomura Loan provided that HPCH, as borrower, would enter into a Collection Account Agreement with the bank holding the Collection Account (in the Grand National Bank). The Agreement was to authorize and direct the Bank to transfer on a daily basis all funds deposited into the Collection Account to the Cash Collateral Account. (Jt. Ex. 11 ¶ 2.12(b).) The Collection Account Agreement and the Cash Collateral Account Agreement implemented these directives. The Collection Account was under dominion and control of the Trust, and the deposited funds were transferred daily into the Cash Collateral Account. (Jt. Ex. 14 §§ 2(c), (e), 7(a).)

HPCH and Doctors Hospital also agreed in the Collection Account Agreement to deposit into the Collection Account all rents due under the Lease. (Jt. Ex. 14 § 7(b).) The Cash Collection Account Agreement provided that the Cash Collateral Account Bank (LaSalle Bank) was to deposit into the Cash Collateral Account the "Receipts [as defined in the Collection Account Agreement] for [Doctors Hospital] Property." (Jt. Ex. 13 ¶ 3(a).) Pursuant to these agreements, $3,712,818.46 was transferred to the Cash Collateral Account. *Doctors Hosp. of Hyde Park v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 818–19 (Bankr. N.D.Ill.2007). Funds of Doctors Hospital to be used as rent thereby flowed in a stream from the Collection Account to the Cash Collateral Account.

B. *Flow of Rent from Daiwa*

The Nomura Loan, together with other documents, dictated that a second and separate stream of Doctors Hospital's cash go to the Cash Collateral Account. (Jt. Ex. 11 ¶ 2.12(a).) Pursuant to the Intercreditor Agreement, Daiwa was required to send new borrowings directly to that account. (Jt. Ex. 12 ¶ 4(a).) The Lease provided, "Rent may be paid by way of transfer of funds by Daiwa in the Cash Collateral Account." (Jt. Ex. 73 ¶ 2.) Thus, both the Lease and the Nomura Loan gave the Trust the authority to take rent payments out of the commingled funds in the Cash Collateral Account and apply them to HPCH's debt service. This was consistent with the Assignment, which "presently gives Assignee the right to collect the Rents and to apply the Rents in partial payments of the Note and Loan Obligations ..." (Jt. Ex. 89 ¶ 2.) The authority to take rent proceeds and apply them to debts is also found in the Nomura Loan. (Jt. Ex. 11 ¶ 2.12(c), (f), (g).)

As to the pre-July 1998 transfers made directly from Doctors Hospital to the Cash Collateral Account, those transfers also constituted rent. Pursuant to the agree-

ments described above, the Trust had the authority to take any rent payments going to the Cash Collateral Account. Although the funds transferred prior to July 1998 did not utilize the entire structure described above, the nature and reason for their transfer did not change the fact that they were used to pay rent.

### C. *The Illinois Lien Theory is not Relevant*

While the parties agreed that New York law controls the loan transaction, Defendant argues that Illinois law controls the definition of "rent" paid on an Illinois lease. It contends that the pre-July 1998 transfers were not payments of "rent" under Illinois law. It reasons that because Illinois is a "lien theory" state in which rent assignments (such as the one involved in this case) merely conveys a *lien* on rents, the Defendant could not have received the pre-July 1998 payments as rent. According to Defendant's argument, during this time period, HPCH, as owner of the Hospital Property, retained ownership of all rents under Illinois Law and Nomura held only a lien interest:

> In Illinois, the landlord retains title to rents, without regard to whether the rent assignment is described as an "absolute assignment." This means that until a rent assignment is "perfected" a lender does not become the owner of the rent, and does not receive payments *qua* rent. In this case, Nomura's rights under the Rent Assignment were not perfected until July 1998. Consequently, prior to July 1998, rents payable by Doctors Hospital under the Lease with HPCH merely represented additional security for the Nomura Loan. If rent had been paid at all during this period, it would have been "owned" by HPCH, as owner of the Hospital Property.

(Def.'s Reply Mem. in Supp. of Mot. to Amend 2.) In Defendant's Memorandum in Support of its Motion to Amend, it cited several cases discussing Illinois' status as a "lien theory" state.

According to Defendant, Plaintiff is wrong to characterize the rent Assignment as an absolute assignment despite express wording of the Assignment making it "absolute." [1]. Defendant further argues that in Illinois, even if a rent assignment is characterized as an "absolute assignment," it conveys only a lien in favor of the mortgagee, citing *In re Foundry of Barrington P'ship,* 129 B.R. 550, 557 (Bkrtcy.N.D.Ill. 1991). It is suggested that while the assignment of rents gave Defendant an interest in the rents and the underlying Lease, such interest was only given to assure payment of the debt. *Id.* at 556–57. Defendant contends that because Illinois is a "lien theory" state, a mortgagee may not enforce a rent assignment until it takes possession of the property or a receiver is appointed to operate the property, *citing Fid. Mut. Life Ins. Co. v. Harris Trust and Sav. Bank,* 71 F.3d 1306, 1308 (7th Cir.1995). Defendant concludes that its interest in rent payments never arose above the status of a lien because it never perfected the rent assignment.

The rule of law cited by Defendant might have been applicable if the Plaintiff were seeking to enforce a rent assignment. Indeed, the *Fid. Mut. Life Ins. Co. v. Harris Trust and Sav. Bank* case involved an attempt to enforce an indemnity agreement following default. In this case, however, no party is seeking to enforce the

1. The Assignment provided, "Assignor does hereby absolutely and unconditionally assign to Assignee all of Assignor's right, title and interest in all current and future Leases and Rents, it being intended by Assignor that this assignment constitutes a present **absolute assignment** ..." (J. Ex. 89 ¶ 2.) (emphasis supplied).

Assignment. Defendant clearly had a right to receive rent payments, and it accepted property of the estate as rent payments regardless of whether or not it perfected its lien interest by following Illinois law.

Defendant's reliance on the Illinois lien theory fails to consider the reality of what occurred in this case. It really is arguing that rent would not have been paid because the payor lacked full rights in the money paid. For purposes of this fraudulent action, what is relevant is that Doctors Hospital made rent payments from money that it controlled and which the LaSalle Trust accepted and then applied in partial payment on the Nomura Loan.

**D. *Argument that HPCH did not "Own" the Rent Payments Made by Doctors Hospital is not Relevant***

Defendant also argues that the pre-July 1998 payments were not "rent" in the hands of Doctors Hospital because HPCH, as landlord/mortgagor, was owner of the rent due under the Lease:

> In much the same way the Court decided that the post-July 1998 payments were not owned by Doctors Hospital but instead by MMA Funding, the pre-July 1998 payments, if they were "rent," could likewise not have been owned by Doctors Hospital under Illinois law. Instead, if the funds were "rent" in the hands of Doctors Hospital, they could have only been owned by HPCH. However, since the Court determined that they were not owned by HPCH, such funds could not have represented "rent" in the hands of Doctors Hospital.

(Def.'s Reply Mem. in Supp. of Mot. to Amend 13.)

Determining who "owned" the rent money when rent was paid has little to do with a fraudulent transfer analysis. Regardless of who might be asserted to "own" Doctors Hospital's money used as rent payments, Defendant was the recipient of them. As to the pre-July 1998 payments, this is certain: Doctors Hospital took from its general operating account funds in its possession to pay rent (which proved excessive over market rent rates), and those payments were received by the Defendant. No one in this case contested the right of Doctor's Hospital to pay those monies. Further, this occurred at a time when Doctors Hospital was insolvent and did not receive reasonably equivalent value. No other party has pleaded or contended in this case that it "owned" those funds and Doctors Hospital had no right to use them. In effect Defendant's argument is a search for declaratory judgment as to ownership of those funds by some other party in some hypothetical suit that was never filed.

**E. *The Trust was Authorized to Receive Payments of Rent but not Debt Payments because its Guaranty was not Called***

Defendant's Trust argues that because it was strictly a lender in the Nomura Loan Transaction, it was immunized from receiving rent payments and any payments that it received were debt payments. It offers the following example: A bank makes a mortgage loan to a borrower and obtains a mortgage and assignment of lease as collateral, after which Lease payments are made directly to the bank. In this scenario, Defendant argues that the bank has not received rent, but rather it received a payment on the underlying promissory note and mortgage.

The Trust's argument ignores existence in this case of the Assignment which provided:

> Assignor does hereby absolutely and unconditionally assign to Assignee all of

> Assignor's rights, title, and interest in all current and future Leases and Rents, it being intended by Assignor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. This Section 2 presently gives Assignee the right to the Collect the Rents and to apply the Rents in partial payments of the Note and Loan Obligations and otherwise in accordance with the terms of the Loan Agreement.

(Jt. Ex. 89 ¶ 2.) The Assignment in evidence was supplemented by documents evidencing cash flow. The Trust cannot disregard the fact that it received and was intended to receive rent payments by suggesting that it was merely a lender.

It should also be noted that the Trust had no basis to take or expect debt payments from Doctors Hospital. Doctors Hospital had an obligation to make rent payments under the Lease, but did not have an obligation to make the Nomura Loan debt payments unless its Guaranty was called. The Guaranty was not called during the time period in question.

The Trust, on the other hand, had a right to receive debt payments from HPCH, as well as the right to receive rent payments from Doctors Hospital based on its status as assignee of the Lease. The Assignment expressly provided that the Trust had the right to collect the rents and apply them in partial payment of the Nomura Loan. (Jt. Ex. 89 ¶ 2.) The Trust did not have a right to receive debt payments from Doctors Hospital; it only had a right to receive rent.

### F. *The Method of Payment Provisions in the Lease did not Transform the Rent Payments into Debt Payments*

Defendant also argues that Doctors Hospital's direct transfers to the Trust must have been debt payments because the Lease only permitted payment of rent in one of two ways: (1) by payment to HPCH at Doctors Hospital's place of business or other such place as designated by HPCH; or (2) by way of transfer of funds by Daiwa to the Cash Collateral Account.

However, HPCH did designate another entity to receive rent when in the Assignment it assigned its right to receive rent to the Trust. (Jt. Ex. 89.) It was thereby made clear to all parties to the Nomura Loan transaction that Doctors Hospital would pay rent to the Trust. Pursuant to direction of HPCH in the Assignment, Doctors Hospital complied with the Lease by paying rent to the Trust.

### G. *No Default was Declared to Trigger Obligation to Pay Debt*

Defendant argues that Doctors Hospital failure to comply with the cash flow requirements of the Nomura Loan by direct payments to Defendant, resulted in an event of default triggering its obligations to make debt payments on the Guaranty.

No evidence in the record suggested that Defendant declared a default and proceeded to enforce the Guaranty. Plaintiff agreed to waive notice of default in the Guaranty. Regardless of this waiver, however, there is no evidence to suggest that a default was declared. Under terms of the Guaranty, an event of default would have required Doctors Hospital to pay all of the outstanding indebtedness on the Nomura Loan. (Jt. Ex. 17, ¶ 7(a).) Defendant never suggested or demanded that any such action be taken. Instead, Defendant only required that Doctors Hospital comply strictly with the cash flow provisions in the loan agreements. (Jt. Exs. 43, 44.)

### H. *The Trust's Status as a Real Estate Mortgage Investment Conduit ("REMIC") Is Irrelevant*

Defendant argues that under the Internal Revenue Code it can only hold certain

kinds of assets, that rent is not one of them, and therefore it could not lawfully have received rent payments. According to Defendant, the Internal Revenue Code provisions permitting REMIC's are very specific about what kinds of assets a REMIC can hold. The Trust argues that under the Internal Revenue Code, the Trust could not have held the Hospital Property itself and could not have received "rent."

Defendant has made this argument despite lack of evidence that it conducted business in compliance with REMIC tax regulations. This is not surprising considering that the issue in this case is not Defendant's compliance with the Internal Revenue Code. The argument is irrelevant to the issue of whether rent was in fact paid, an issue determined by the actual conduct of parties based on the evidence. As shown by that evidence, Defendant accepted rent payments from the Debtor and later applied them as payments on the Nomura Loan irrespective of the Trust's status as a REMIC.

### I. *The Trust's Reliance on a Title in a Damage Chart in Misplaced*

The Trust argues that "additional evidence supports the conclusions that the pre-July 1998 payments were 'debt,' not 'rent.'" (Def.'s Mem. in Supp. of Mot. to Amend 20.) The argument was not offering or requesting a reopening of the case to offer new evidence, but was rather emphasizing and interpreting certain evidence already received. The Trust refers to use of the term "debt service payments" at the head of a column on Plaintiff's damages calculation chart to support its argument that the payments it received were not rent payments. (Def. Mem. in Supp. of Mot. to Amend 20.) Carrie Widman, the witness who prepared the chart, did not testify as a witness on the types of transactions involved here, but rather testified as a witness who provided calculation of damages. The words "debt service payments" that she chose to use to label her calculation of damages on her chart do not lead to the conclusion that the amount stated below were in fact debt payments. The document was received as a demonstrative exhibit providing an undisputed mathematical calculation, not to show that the title of the column was correct.

### J. *The Findings and Conclusions do not Yield an "Anomalous Result"*

Beginning in July 1998, the requirements of the Cash Flow Agreements[2] were followed. For the period during which Doctors Hospital and MMA Funding complied with these requirements, it was earlier found that the transfers were not made with funds owned by Doctors Hospital and therefore were not recoverable by Plaintiff. However, for the pre-July 1998 period, during which the Cash Flow Agreements were not followed, it was found that the transfers were made with funds owned by Doctors Hospital. If Doctors Hospital and MMA Funding had complied with the Cash Flow Documents prior to July 1998, Defendant argues that it would have prevailed with respect to all transfers challenged in this case. The Trust argues that this yields an anomalous result: Doctors Hospital and MMA Funding did not observe requirements of the unambiguous contracts to which they were a party and for that reason alone Doctors Hospital recovers more than $4 million from Defendant.

The Trust was fully aware that Doctors Hospital was making rent payments directly to it and did not insist on strict

2. The Cash Flow Agreements includes the Intercreditor Agreement, the Cash Collateral Agreement, the Collection Account Agreement, and the Payment Direction Letter.

compliance with the transaction documents until July 1998. The Defendant Trust cannot be rewarded for its lack of diligence in failing to require the unambiguous transaction documents to be followed. Further, the Trust fails to cite any authority to suggest that the documents and events in evidence should in effect be rewritten to avoid an anomalous result if one existed.

Life and the law are filled with large and small ironies and anomalies, but it is not surprising to find that disregard of agreements can have consequences different from adherence to agreements.

## II. *The Trust was Initial Transferee of the Pre-July 1998 Rent Payments*

In the original Findings and Conclusions, it was determined that Defendant was the initial transferee of the pre-July 1998 rent payments made by Doctors Hospital. In its Motion to Amend, Defendant argues that the Judgment should be altered, amended and reopened to find that Defendant was not the "initial transferee" of the pre-July 1998 payments under § 550 of the Bankruptcy Code.

Defendant reasons that under the original Findings and Conclusions the pre-July 1998 payments were passed-through to the Certificate holders by Defendant. According to Defendant, this finding, as well as provisions of the Pooling and Servicing Agreement ("PSA"), the law relating to Real Estate Mortgage Investment Conduit ("REMIC") financing transactions, and precedent in the Seventh Circuit, compel the conclusion that Defendant was not the "initial transferee" of the pre-July 1998 payments but rather was a "conduit" or financial intermediary.

The Trust's theory fails for the following reasons: (1) There was no evidence presented to show that the Trust transferred any funds to its Certificate holders in the period prior to July 1998 or that it adhered to the provisions governing a REMIC; (2) the policy underlying precedents that apply the "conduit" theory does not apply here; and (3) the Trust exercised dominion and control of the rent payments and was therefore in fact and law the initial transferee under applicable Seventh Circuit precedent.

### A. *There is no Evidence that the Trust Transferred any Funds to its Certificate holders in the Period Prior to July 1998 or adhered to Provisions Governing a REMIC*

The Trust asserts that it cannot be the initial transferee because the pre-July 1998 payments were "passed-through" by LaSalle as Trustee to the Certificate holders. For support, the Trust cites part of paragraph 192 in the original Findings:

> ... Each month the Trust took from the funds in the Nomura Cash Collateral Account amounts sufficient to fund reserve accounts for capital improvements, taxes and insurance, and the debt service on the Nomura Loan (the "Reserve Accounts"). Funds representing the debt service payments were forwarded to the Trust's bondholders.

*Doctors Hosp. of Hyde Park v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 360 B.R. 787, 815 (Bankr.N.D.Ill.2007). But it failed to cite the beginning of paragraph 192 which provided, "**After** July 7, 1998 ..." *Id.* (emphasis supplied). Finding No. 192 therefore applies only to the time period after July 7, 1998. The Trust failed to demonstrate by evidence at trial that transfers to the Certificate holders took place. Absent such, the Trust's argument that it cannot be the initial transferee because the payments were "passed-through" to its Certificate holders must fail.

The Trust also argues that evidence demonstrated that LaSalle as Trustee, and as the fiduciary trustee of a REMIC, could not have been the "initial transferee" of the pre-July 1998 payments made by Doctors Hospital. The Trust supports its argument by stating that a REMIC entity is not subject to federal taxation, all taxable income of the REMIC is passed-through to certificate holders. Therefore, the argument is that neither LaSalle as Trustee nor the Trust had any financial stake in the pre-July 1998 payments.

There is no evidence that the Defendant adhered to statutory and regulating provisions governing a REMIC. Absent any evidence other than citations to provisions governing a REMIC, this argument fails.

**B. *The Trust is not an Innocent Intermediary***

The Trust argues that it was not the initial transferee because it was an innocent intermediary. The theory on which the Trust relies was developed in the law to protect innocent intermediaries who have no common interest with the ultimate transferee. *See In re Cash Currency Exchange, Inc.,* No. 85 A 145, 1987 WL 46369, at *2 (Bankr.N.D.Ill. Sept.25, 1987).

In this case, the Trust is not an innocent intermediary. The original Conclusions articulated reasoning for this based on the Trust's active role pursuant to the terms of the Pooling and Servicing Agreement ("PSA"):

> The PSA, which created the Trust made clear that it was not the type of pass-through entity that courts refer to as having no interest in the transfers; the Trust was the entity that was intended recipient of the transfers. Under the PSA, the Trust was the owner of the Mortgage Loans, including the Nomura Loan, and other assets related to the Mortgage Loans. (Jt. Ex. 23 at 64–67.) The operation and management of the Trust Fund was governed by the Trustee generally through the Servicer and Special Servicer. (Jt. Ex. 23, Articles III and IV generally, at 85–174.) The obligations and duties of the Trustee, the Servicer, the Special Servicer and other parties were delineated in the PSA. (Jt. Ex. 23.) The corpus of the Trust or Trust Fund consisted generally of all the Mortgage Loans transferred to the Trust, the right to collect funds under the Mortgage Loans, rights to insurance proceeds with respect to the Mortgage Loan, all rights related to the Mortgage Loans, including any rights and security granted in connection with the Mortgage Loans such as guarantees and indemnities, and the Lock Box Accounts, Cash Collateral Accounts, Escrow Accounts, and the like. (Jt. Ex. 23 at 59, 64.)
>
> The Trustee, generally through the Servicer and Special Servicer, performed all duties that an owner of a mortgage loan would perform, including foreclosing and generally enforcing all of the rights with respect to the Mortgage Loans and the related assets of the Trust Fund. (Jt. Ex. 23, Articles III and IV generally, at 85–174.)
>
> The Trustee, the Servicer, and the Special Servicer were all entitled to receive fees and reimbursements for the services performed. (Jt. Ex. 23, at 107, 209.) In certain instances, the Trustee, the Servicer or Fiscal Agent made advances of funds to certificate holders in connection with Distributions. (Jt. Ex. 23 at 171–74.) The certificate holders had no rights with respect to operation and management of the Trust Fund and had no liability for actions of the Trustee, Servicer or Special Servicer or any

other party to the Pooling and Service Agreement. (Jt. Ex. 23 at 222.)

Generally, only the Trustee, the Servicer or the Special Servicer had rights to enforce the Mortgage Loans and other assets comprising the Trust Fund. (Jt. Ex. 23 at 222, Articles III and IV, at 85–174.) In substance, the Trustee operated the business of liquidating the corpus of the Trust and making distributions to certificate holders based upon the type and priority of the Certificate. As evidenced by the instant litigation and the Trust's litigation against Nomura, the Trustee on behalf of the Trust sued and defended the Trust. Unlike an escrow agent or depositing bank, the Trust acting through the trustee did not pass through the transfers in kind. The Trustee in operating the business of the Trust had a financial interest in the transfers. This was the vehicle chosen to operate business of the Trust.

*Doctors Hosp. of Hyde Park v. Desnick (In re Doctors Hosp. of Hyde Park)*, 360 B.R. 787, 844–45 (Bankr.N.D.Ill.2007).

Defendant's operations under the PSA and its sole control of the Cash Collateral Account overwhelmingly support the finding and conclusion that the Trust was the initial transferee. Under the PSA, Defendant was authorized to "administer" and "service" approximately $2.12 billion in securitized mortgage loans that it owned. (Jt. Ex. 23 p. 2 n. 1.) The Trust's obligations included collection of taxes and assessments, maintenance of various escrow account and other bank account, making withdrawals from those account, investing funds, maintaining insurance policies, enforcing "due-on-sale" clauses, obtaining appraisals of mortgaged properties, agreeing to modification of mortgages, collecting fees, and inspecting properties. (Jt. Ex. 23.)

Based on the above, it is clear that the Trust exercised active dominion and control over the funds such that it was the initial transferee of payments received pre-July 1998 and could not be considered an innocent intermediary.

### C. *The Trust was the Initial Transferee under Seventh Circuit Precedent*

It was held in the original Findings and Conclusions that the Trust is the initial transferee of the pre-July 1998 rent payments under the standard set forth in *Bonded Fin. Serv., Inc. v. European Am. Bank (In re Bonded Fin. Serv., Inc.)*, 838 F.2d 890 (7th Cir.1988). In that case, the debtor sent a check to the bank with a note directing the bank to deposit the check into the account of a Michael Ryan. 838 F.2d 890 (7th Cir.1988). It was found that the bank was not the initial transferee, but rather was a conduit because it acted as a financial intermediary and it received no benefit. *Id.* at 893. Thus, the transferee bank was considered a financial intermediary, "no different from a courier or an intermediary on a wire transfer." *Id.* It was noted that "transferee" must mean something different from "possessor," or "holder" or "agent." *Id.* at 894

The Seventh Circuit panel opinion explained circumstances under which the bank would have been an initial transferee: "If the note accompanying Bonded's check had said: 'use this check to reduce Ryan's loan' instead of deposit this check into [Ryan's] account', § 550(a)(1) would provide a ready answer. The Bank would be the 'initial transferee' . . ." *Id.* at 892.

It was further opined:

> [W]e think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for

C, then C is the "initial transferee"; the agent may be disregarded.

*Id.* at 893.

In this case, Doctors Hospital did not make the transfers to the Cash Collateral Account in a context where the transfers were simply deposited to an account controlled by HPCH. Pursuant to terms of the Nomura Loan, the Lease, and the cash flow agreements, the transfers were rent that the Trust, pursuant to the instructions of HPCH, applied to the Nomura Loan debt. (Jt. Ex. 11 ¶ 2.12.) The Assignment provided that the Trust had "the right to collect the Rents and to apply the Rents in partial payment of the Note and Loan Obligations ..." (Jt. Ex. 89 ¶ 2.) Further, the Nomura Loan, implemented by the cash flow agreements, directed the Trust to use the rent to reduce HPCH's debt, falling within the analogous example provided in *Bonded Financial.* The Trust in this case did benefit from the rent payments it received, as it used them in partial payments of the loan it made to HPCH.

"When the transferee is a creditor, or has a business relationship with the debtor, and it receives a transfer that is applied to its own debt, the transferee cannot be a conduit." *In re Toy King Distributors, Inc.,* 256 B.R. 1, 146 (Bankr. M.D.Fla.2000). In this case, Doctors Hospital had such a relationship with the Trust. Doctors Hospital was obligated to pay rent into a Cash Collateral Account over which HPCH had no dominion or control. The Trust, which controlled the Cash Collateral Account applied the rent payments to HPCH's debt pursuant to the directions contained in the provisions of the Lease, Nomura Loan, and the Assignment.

Therefore, the Trust's argument fails and the Judgment will not be altered, amended, or reopened to find that it was not the initial transferee of the transfers.

### *CONCLUSION*

For reasons stated here and in the original Findings and Conclusions, the Motions filed by Plaintiff and Defendant will each be denied by separate orders.